Stephen Sorensen (SBN 199408)
Elliot McGraw (SBN 275613)
BAILEY GLASSER
1055 Thomas Jefferson, Suite 540
Washington, DC 20007
Phone: 202-463-2101
Email: ssorensen@baileyglasser.com
        emcgraw@baileyglassser.com

*Counsel to the Federal Deposit Insurance Corporation as Receiver for Silicon Valley Bank*

Lynn R. Fiorentino (SBN 226691)
44 Montgomery Street, 38th Floor
ARENTFOX SCHIFF LLP
San Francisco, CA 94104
Phone: 415-757-5500
Email: lynn.fiorentino@afslaw.com

Lawrence H. Heftman
David C. Giles
Michael K. Molzberger
(*pro hac vice* motions forthcoming)
ARENTFOX SCHIFF LLP
233 S. Wacker Dr., Suite 7100
Chicago, IL 60606
Phone: 312-258-500
Email: lawrence.heftman@afslaw.com
        david.giles@afslaw.com
        michael.molzberger@afslaw.com

*Counsel to the Federal Deposit Insurance Corporation as Receiver for Silicon Valley Bank*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR SILICON VALLEY BANK, | Case No. 5:25-cv-569 |
| Plaintiff, | |
| v. | **COMPLAINT** |
| GREGORY BECKER, DANIEL BECK, MARC CADIEUX, MICHAEL DESCHENEAUX, MICHAEL KRUSE, LAURA IZURIETA, ERIC BENHAMOU, ROGER DUNBAR, JOEL FRIEDMAN, MARY MILLER, KATE MITCHELL, BEVERLY MATTHEWS, GAREN STAGLIN, ELIZABETH BURR, RICHARD DANIELS, ALISON DAVIS, AND JEFFREY MAGGIONCALDA, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiff, the Federal Deposit Insurance Corporation as Receiver for Silicon Valley Bank

("FDIC-R"), complains as follows against Gregory Becker, Daniel Beck, Marc Cadieux, Michael

Descheneaux, Michael Kruse, and Laura Izurieta ("Officer Defendants") and Eric Benhamou,

1 Roger Dunbar, Joel Friedman, Mary Miller, Kate Mitchell, Beverly Matthews, Garen Staglin,

2 Elizabeth Burr, Richard Daniels, Alison Davis, and Jeffrey Maggioncalda ("Director

3 Defendants").

4                                    **INTRODUCTION**

5          1.      This is an action to recover billions of dollars in damages caused by the

6 negligence, gross negligence, and breaches of fiduciary duty committed by former officers and

7 directors of Silicon Valley Bank ("SVB" or "Bank"). SVB was closed on March 10, 2023, in

8 what is now the third largest bank failure in United States history, and the FDIC-R was appointed

9 as the Bank's receiver.

10         2.      SVB represents a case of egregious mismanagement of interest-rate and liquidity

11 risks by the Bank's former officers and directors. In the two years before the Bank failed, the

12 Officer Defendants and Director Defendants ignored fundamental standards of prudent banking

13 and SVB's own risk policies in pursuit of short-term profit for the Bank's parent, SVB Financial

14 Group ("SVBFG"). These Defendants—who had identical titles as officers and directors of

15 SVBFG—ignored clear warnings of risk to the Bank's financial condition, including repeated

16 breaches of the Bank's own interest-rate-risk models, during a period of actual or likely increases

17 in interest rates. The Defendants ignored these and other warnings to try to boost SVBFG's short-

18 term income and its stock price, even though doing so exposed the Bank to unreasonable risk.

19 They focused on short-term profits and support of SVBFG's stock price rather than on prudently

20 managing interest-rate risk and liquidity risk at the Bank. This conduct was negligent, grossly

21 negligent, and a breach of the fiduciary duties of care and loyalty owed by each Defendant to

22 SVB. As a result of these breaches, SVB suffered billions of dollars in losses that would have

23 been avoided had Defendants properly overseen and managed SVB's risk.

24         3.      The Officer Defendants and Director Defendants breached their duties in at least

25 three ways. First, the Officer Defendants and seven of the eleven Director Defendants

26 overexposed SVB to investments in long-term securities, held primarily in the Bank's unhedged

27 held-to-maturity ("HTM") securities portfolio, to try to increase yield in 2021. In making or

28 approving these imprudent investments, the Officer Defendants and seven of the Director

Defendants ignored the obvious risk that an increase in interest rates would result in substantial losses to SVB, thereby reducing its capital and liquidity. These investments overconcentrated SVB in long-duration HTM assets contrary to duration and HTM exposure levels recommended by consultants to SVBFG and SVB and caused SVB to repeatedly breach its own interest-rate-risk policies and metrics. But instead of taking corrective action to remedy this risky overconcentration, address the policy and risk-metric breaches, or otherwise reduce SVB's interest-rate risk, the Officer Defendants modified the assumptions underlying one of SVB's risk models—without legitimate basis—to try to make it appear as if SVB was not in breach. At the same time, the Officer Defendants and seven of the Director Defendants caused SVB to continue holding an HTM portfolio with overexposure to interest-rate risk that was an extreme outlier compared to SVB's peer banks, particularly at a time of actual and anticipated rising interest rates. These Defendants mismanaged the HTM portfolio, and the Officer Defendants altered SVB's risk metrics, despite obvious and substantial risks to SVB, to allow SVBFG to show short-term income and to attempt to boost its stock price.

4.    Second, from 2021 through July 2022, the Officer Defendants and the same seven Director Defendants caused SVB to terminate interest-rate hedges on its available-for-sale ("AFS") securities portfolio. These hedges, which were entered into as interest-rate swaps, partially protected the AFS portfolio from losses in the event of an increase in interest rates. Ignoring the obvious risk of removing this protection during a period of anticipated and actual rising interest rates, the Officer Defendants and seven Director Defendants caused SVB to terminate and monetize the hedges to try to satisfy SVBFG's earnings expectations and thereby improve its stock price. Doing so allowed SVBFG to show a short-term increase in earnings and ultimately provided income for SVB to resume a dormant program of paying "bank to parent" dividends to SVBFG. In this way, the Officer Defendants and seven Director Defendants sought short-term benefits for SVBFG at the expense of amplifying SVB's known and substantial exposure to massive losses in a rising interest-rate environment.

5.    Third, five of the Officer Defendants and ten of the Director Defendants were responsible for SVB's paying a grossly imprudent $294 million bank-to-parent dividend to

SVBFG in December 2022—less than three months before SVB's failure. As officers and directors of SVB, these Officer Defendants and Director Defendants had a duty of undivided loyalty to the interests of the Bank. Further, bank holding companies (like SVBFG) have a responsibility to serve as a source of financial and managerial strength to subsidiary banks (like SVB). But instead of complying with their loyalty obligations and insisting that SVBFG serve as a source of strength, these Officer Defendants and Director Defendants (who were also SVBFG's officers and directors) caused SVB to issue a dividend that deprived SVB of essential capital and liquidity, for the sole benefit of SVBFG and its shareholders, at a time when SVB was in financial distress, in addition to harming the Bank by overexposing it to interest-rate risk in its HTM portfolio and removing the protection of the interest-rate hedges.

6.     As a result of the mismanagement of SVB's HTM portfolio, the termination of the interest-rate hedges that partially protected SVB's AFS portfolio, and the issuance of the bank-to-parent dividend, SVB suffered billions of dollars in losses.

## THE PARTIES

### A.    Plaintiff

7.     The FDIC is a corporation and an instrumentality of the United States of America established under the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811-1835a. On March 10, 2023, the California Department of Financial Protection and Innovation closed SVB and appointed the FDIC as Receiver. *See* 12 U.S.C. § 1821(c). Under 12 U.S.C. § 1821(d)(2)(A)(i), the FDIC-R succeeded by operation of law to all rights, powers, titles, and privileges of SVB and, among others, the depositors, accountholders, and stockholders of SVB. The FDIC-R succeeded to all rights and claims against, among others, SVB's former directors and officers. In this action, the FDIC-R seeks to recover damages resulting from Defendants' tortious conduct and breaches of fiduciary duty to SVB.

### B.    The Officer Defendants

8.     Gregory Becker ("Becker") was the Chief Executive Officer of SVB and a director of the Bank from 2011 until it failed.

9.     Daniel Beck ("Beck") was the Chief Financial Officer of SVB and a member of

- 4 -

the joint Asset Liability Management Committee ("ALCO") for SVB and SVBFG from 2017 until the Bank failed.

10.    Marc Cadieux ("Cadieux") was Chief Credit Officer of SVB and a member of ALCO from 2013 until the Bank failed.

11.    Michael Descheneaux ("Descheneaux") was President of SVB from 2017 until the Bank failed and Chief Financial Officer from 2007 to 2017. He also was a member of ALCO from 2021 until the Bank failed.

12.    Michael Kruse ("Kruse") was Treasurer of SVB and Chair of ALCO from 2010 until the end of 2022 but remained a member of ALCO until the Bank failed.

13.    Laura Izurieta ("Izurieta") was the Chief Risk Officer of SVB from 2016 until April 2022. Izurieta also was a member of ALCO from 2017 to April 2022.

**C.    The Director Defendants**

14.    Eric Benhamou ("Benhamou") was a director of SVB from 2005 until the Bank failed, a member of the joint Finance Committee for SVB and SVBFG beginning in at least 2013 until the Bank failed, and a member of the joint Risk Committee for SVB and SVBFG beginning in 2015 until the Bank failed.

15.    Elizabeth Burr ("Burr") was a director of SVB from 2022 until the Bank failed.

16.    Richard Daniels ("Daniels") was a director of SVB from 2020 until the Bank failed and a member of the Risk Committee beginning in April 2022.

17.    Alison Davis ("Davis") was a director of SVB from 2020 until the Bank failed.

18.    Roger Dunbar ("Dunbar") was a director of SVB from 2005 to April 2022, Chair of the Board from 2012 to April 2022, a Finance Committee member from no later than 2013 to April 2022, and Chair of the Risk Committee from 2015 to April 2022.

19.    Joel Friedman ("Friedman") was a director of SVB from 2005 until the Bank failed, Chair of the Finance Committee from no later than 2013 until the Bank failed, and a Risk Committee member from 2015 until the Bank failed.

20.    Jeffrey Maggioncalda ("Maggioncalda") was a director of SVB from 2012 until the Bank failed.

- 5 -

1

2       21.     Beverly Matthews ("Matthews") was a director of SVB from 2020 until the Bank

3   failed, Chair of the Board from April 2022 until the Bank failed, and a Risk Committee member

    from at least October 2021 until the Bank failed.

4       22.     Mary Miller ("Miller") was a director of SVB from 2016 until the Bank failed, a

5   Finance Committee member from 2015 until the Bank failed, and a Risk Committee member

6   from 2019 until the Bank failed.

7       23.     Kate Mitchell ("Mitchell") was a director of SVB from 2010 until the Bank failed,

8   a Finance Committee member from April 2022 until the Bank failed, Chair of the Risk

9   Committee from April 2022 until the Bank failed, and a Risk Committee member from 2015 until

10  the Bank failed.

11      24.     Garen Staglin ("Staglin") was a director of SVB from 2012 until the Bank failed

12  and a Risk Committee member from 2018 until the Bank failed.

13      25.     The Director Defendants who served on the Finance Committee, the Risk

14  Committee, or both are referred to in this complaint as "Finance and Risk Directors."

15      26.     In addition to service as an officer or director of SVB, each Defendant had an

16  identical (or materially identical) title at SVBFG. Each of the committees described above—the

17  Asset Liability Management Committee, the Finance Committee, and the Risk Committee—also

18  were unitary committees that acted on behalf of both the Board of Directors of SVB and the

19  Board of Directors of SVBFG.

20      27.     A chart of the Officer Defendants and Director Defendants with their positions and

21  committee membership is below:

22

| Name | SVB Title | Committee(s) |
|------|-----------|--------------|
| Gregory Becker | Chief Executive Officer | |
| Daniel Beck | Chief Financial Officer | ALCO |
| Marc Cadieux | Chief Credit Officer | ALCO |
| Michael Descheneaux | President | ALCO |
| Michael Kruse | Treasurer | ALCO |
| Laura Izurieta | Chief Risk Officer | ALCO |

COMPLAINT

| | | |
|---|---|---|
| Eric Benhamou | Director | Finance Committee<br>Risk Committee |
| Roger Dunbar | Director | Finance Committee<br>Risk Committee |
| Joel Friedman | Director | Finance Committee<br>Risk Committee |
| Mary Miller | Director | Finance Committee<br>Risk Committee |
| Kate Mitchell | Director | Finance Committee<br>Risk Committee |
| Beverly Matthews | Director | Risk Committee |
| Garen Staglin | Director | Risk Committee |
| Richard Daniels | Director | Risk Committee |
| Elizabeth Burr | Director | |
| Alison Davis | Director | |
| Jeffrey Maggioncalda | Director | |

## JURISDICTION

28.     The Court has subject-matter jurisdiction over this case under 12 U.S.C.
§ 1819(b)(1) and (2) and 28 U.S.C. §§ 1331 and 1345. The FDIC-R has the power to sue in any court of law. 12 U.S.C. § 1819(a).

## VENUE

29.     Venue is proper in this judicial district under 28 U.S.C. § 1319(b) because a substantial part of the events and omissions giving rise to the claims asserted in this case occurred in this judicial district.

## DIVISIONAL ASSIGNMENT

30.     Under Civil Local Rule 3-5 and 3-2(c) and (e), this case should be assigned to the San Jose Division. This case does not fall into one of the district-wide categories provided for in General Order No. 44, and a substantial part of the events and omissions giving rise to the claims in this case occurred in Santa Clara County. The case accordingly arises in Santa Clara County and should be assigned to the San Jose Division.

COMPLAINT

1

**FACTUAL BACKGROUND**

2

    **A.**      **SVB and its Key Risk Committees**

3

      31.      SVBFG began operating in 1983 and was headquartered in Santa Clara, California.

4

SVB was a California state member bank and was SVBFG's principal subsidiary.

5

      32.      As of year-end 2022, SVBFG had about $211.8 billion in total assets. About $209

6

billion of these assets were attributable to SVB, which accordingly accounted for about 98.67%

7

of SVBFG's assets.

8

      33.      Since at least 2021, SVBFG's and SVB's Boards of Directors overlapped

9

completely. That is, each member of SVBFG's Board of Directors was also a member of SVB's

10

Board of Directors, and vice versa. There were no independent directors of SVB.

11

      34.      Not only were the directors entirely overlapping, but SVBFG and SVB also held

12

joint board meetings producing a single set of joint minutes.

13

      35.      Decisions concerning SVB's assets were made at joint board and committee

14

meetings of both SVBFG and SVB. These decisions and other actions resulted in conflicts of

15

interests where the Defendants financially benefitted SVBFG at the expense of the Bank's best

16

interests.

17

      36.      SVBFG's and SVB's Boards of Directors assigned and delegated responsibilities

18

to unitary committees that acted on behalf of both boards, including the Finance Committee, the

19

Risk Committee, and the Asset Liability Management Committee.

20

      37.      Under its charter the Finance Committee's purpose was to oversee "certain

21

corporate strategic matters," the "financial performance" of SVBFG and SVB and "capital

22

planning, stress testing, and capital and liquidity management, including processes and

23

compliance with applicable regulatory requirements, jointly with the … Risk Committee." The

24

Finance Committee also was tasked under its charter with reviewing, discussing with

25

management, and making recommendations regarding (a) investments, (b) derivative activities,

26

(c) hedging activities, (d) management of deposits and client funds, and (e) dividend strategies

27

and any proposed dividend declarations. The Finance Committee also had responsibility for

28

capital and liquidity management, and, in concert with the Risk Committee, for financial risk

1    management and remediation.

2         38.    Under its charter the Risk Committee's purpose was to assist the Boards of

3    Directors of SVBFG and SVB in overseeing enterprise-wide risk management policies and

4    frameworks and the risk profile of SVBFG and SVB, including monitoring and understanding

5    changes to the risk profile, followed by escalation to the board of any matters of concern. The

6    Risk Committee also was responsible for overseeing SVBFG's and SVB's compliance with their

7    Risk Appetite Statement, including taking appropriate action upon notification of any breaches of

8    the Risk Appetite Statement. The Risk Committee thus had responsibility for financial risk

9    management and market risk, including specifically capital and liquidity risk management for

10   both SVBFG and SVB.

11        39.    The Asset Liability Management Committee was composed of senior management

12   from SVBFG and SVB and had responsibility to monitor changes in the composition of SVBFG's

13   and SVB's assets. The committee also had responsibility to "review and approve strategies

14   recommended by management that promote optimal financial performance while managing

15   financial risks within levels that are consistent with the Company's domestic and international

16   business model and risk appetite." Further, the committee advised "senior management on the

17   appropriate use of Company resources to position the balance sheet for minimal liquidity risk,

18   appropriate interest rate sensitivity, optimal allocation of capital resources, and maximum

19   shareholder value." Under its charter, the committee was responsible for recommending strategies

20   "consistent with corporate strategic objectives and should adhere to regulatory requirements and

21   guidelines and internal policy limitations."

22        40.    In addition to holding the same titles at both SVBFG and SVB, members of the

23   Boards of Directors and the Finance Committee, Risk Committee, and Asset Liability

24   Management Committee repeatedly made decisions on behalf of both SVBFG and SVB without

25   distinguishing between the two entities.

26   **B.    SVB's Grossly Imprudent Growth and its Governance and Risk-Management**

27          **Failures**

28        41.    At the beginning of 2018, SVB had about $56 billion in assets and $50 billion in

deposits; by the end of 2019, it had about $70 billion in total assets and $56 billion in deposits.

42.     Between 2020 and 2021, however, SVB more than tripled its assets and deposits. In 2020, SVB's assets nearly doubled to $114 billion, and it had $95 billion in deposits. By the end of 2021, SVB had $209 billion in total assets and $176 billion in deposits.

43.     SVB's growth substantially exceeded that of the banking industry as a whole. Specifically, the industry grew at a rate of approximately 24% from year-end 2019 to year-end 2022, while SVB grew by more than 196% during this same period.

44.     Part of SVB's growth was fueled by deposits that were heavily concentrated in the technology and life-sciences sectors. By year-end 2022, venture-capital-backed companies in these sectors accounted for more than half of SVB's deposits, linking SVB's deposits and deposit growth directly to venture-capital-deal activity and liquidity events associated with those deals.

45.     The vast majority of SVB's deposits also were uninsured because they exceeded the $250,000 threshold for FDIC deposit insurance. As of year-end 2022, SVBFG's and SVB's regulatory filings reflected that approximately 94% of SVB's deposits were uninsured.

46.     SVB's extraordinary deposit growth resulted in a substantially larger base of deposits than in prior years, but also one that was inherently less stable. The newness of these deposits, their concentration in specific industry sectors having highly variable liquidity profiles, their uninsured status, and other characteristics all reduced the "stickiness" of these deposits, leaving SVB particularly vulnerable to the risk of deposit withdrawals in the event of an increase in interest rates or loss of market confidence in SVB.

47.     SVB invested the bulk of this surge in deposits in long-term, fixed-rate, government-backed debt securities, such as U.S. treasuries and mortgage-backed securities.

48.     Interest rates in 2020 and 2021 were at historically low levels. During 2020 and 2021, SVB purchased tens of billions of dollars of long-term securities at historically low, fixed interest rates with the aspiration of generating relatively modest income because of the then-nominal difference between the interest paid to depositors and the long-term interest rates on government-backed securities. SVB's portfolio was part of a plan that focused on growing long-duration security investments to generate yield. That plan and strategy is reflected in presentation

materials provided to the Finance Committee and internal communications among the Officer Defendants and Director Defendants on the Finance Committee, including at the Finance Committee meetings, Finance Committee strategy sessions, and Asset Liability Management Committee meetings.

49.    This investment strategy exposed SVB to severe interest-rate risk of which the Officer Defendants on the Asset Liability Management Committee were fully on notice. These Defendants knew or should have known that in a rising interest-rate environment, long-term securities decline in value and compress net-interest margin (*i.e.*, the difference between the interest income a bank earns from its investments and the interest it pays out to depositors), resulting in reductions in capital, liquidity, and net income.

50.    At the same time, the Finance and Risk Directors also knew or should have known that SVB lacked critical risk-management resources and controls necessary to manage the significant risks associated with SVB's growth and size. Among other things, SVBFG and SVB's chief risk officer left in April 2022 and was not replaced until January 2023. SVB also lacked other foundational best practices, discussed below, related to management of interest-rate and liquidity risk.

**C.    Regulators Repeatedly Warned SVBFG and SVB about Governance and Risk-Management Failures**

51.    Regulators repeatedly put all Defendants on notice that there were significant deficiencies with SVB's management and governance. These notices were provided to each Defendant then serving as an SVB officer or director through reports of examination prepared by SVB's examiners and regulatory notices referred to as "Matters Requiring Attention" and "Matters Requiring Immediate Attention."

52.    As early as 2019, the Federal Reserve issued a joint Report of Examination with state regulators identifying concerns related to the concentration of SVB's deposits and funding structure, including that the volatility of SVB's deposits could pose liquidity risks.

53.    In the 2020 joint Report of Examination, examiners criticized SVB's risk-management practices because those practices were being "outpaced" by SVB's significant asset

growth. The Report of Examination also noted a breach of SVB's economic value of equity at risk ("EVE-at-Risk") tolerance—an important and well-accepted measure of interest-rate risk—and encouraged management to "formalize the process for monitoring, tracking and escalating action plans" to address EVE-at-Risk breaches. Examiners also warned about risks posed by a rising interest rate environment, particularly considering SVB's growth in deposits and the growth in the size and duration of its securities portfolio.

54.    In a November 2, 2021 supervisory letter, examiners concluded that liquidity risk-management practices were inadequate and that this weakness could "underestimate the demands on available liquidity sources in stress." Examiners also noted that liquidity risk-management practices had not kept pace with SVB's significant deposit inflows and very large concentration of uninsured deposits. SVB was ordered to develop a comprehensive liquidity limit and monitoring framework appropriate for its liquidity risk profile. The examiners issued several Matters Requiring Attention and Matters Requiring Immediate Attention that included the following:

(a)    requiring SVB to develop a plan to improve liquidity risk-management practices to meet supervisory expectations and regulatory requirements, including by addressing past supervisory findings, liquidity stress testing, and contingency funding;

(b)    warning of insufficient oversight and risk management in SVB's independent liquidity risk function and internal audit in light of the evolution of SVB's liquidity risk profile following SVB's recent substantial deposit inflows and concentrations in uninsured deposits;

(c)    finding that SVB's stress testing and scenarios were insufficiently stressing liquidity exposures and contained inappropriate assumptions by relying on incomparable peer benchmarks and by ignoring key risk attributes, which limited SVB's ability to differentiate deposit risks in periods of stress;

(d)    determining that deficiencies in deposit segmentation reduced the reliability of SVB's liquidity buffer; and

COMPLAINT

(e)     concluding that SVB's liquidity risk limits and supporting processes were insufficient for the size and complexity of its activities.

55.     In May 2022, examiners again issued a letter on SVB's governance and risk-management program because SVB had ignored their prior warnings. Examiners criticized the "lack of effective board oversight," explaining that "[w]hen risk management weaknesses were indicated by breaches of internal risk metrics, internal audits and past regulatory examinations, the board did not hold senior management accountable to remediate these issues."

56.     In three Matters Requiring Immediate Attention that followed the May 2022 letter, examiners determined that (a) "the Board's oversight over the Firm's risk-management practices is not adequate and has contributed to an ineffective risk management program," (b) "SVB's existing risk management program is not effective," and (c) "Internal Audit Department's (IA) methodology and programs do not sufficiently challenge management, provide the Audit Committee with sufficient and timely reporting, or ensure the timely analysis of critical risk management functions and the overall risk management program."

57.     In a supervisory ratings letter dated August 17, 2022, examiners downgraded SVB to a composite score of "3" on the "CAMELS" supervisory rating system (which assesses insured depository institutions' capital adequacy, asset quality, management, earnings, liquidity, and sensitivity to market risk). This rating reflected the examiners' determination that SVB exhibited supervisory concern in one more or more of these component areas, including specifically the management component, which also was downgraded to a "3" rating. Examiners found that "the board's oversight does not meet supervisory expectations," the "risk management program is not effective," and there was a lack of "foundational liquidity risk management elements."

58.     In another supervisory letter and accompanying Matter Requiring Attention, dated November 15, 2022, examiners further warned that the Bank's interest-rate-risk models were "unreliable" because they "gave a false sense of safety in a rising rate environment and masked the need to take actions earlier in the rate cycle." Examiners further noted that this deficiency "call[ed] into question the reliability of [interest-rate risk] modeling and the effectiveness of risk management practices" at SVB.

COMPLAINT

1

2

**D.    SVBFG and SVB's Own Management Recognized Governance and Risk Management Failures**

3      59.    Beyond the warnings of examiners, the Officer Defendants themselves recognized

4    that the Bank's risk-management practices and controls were deficient. Becker, Beck, and

5    Izurieta, among others, regularly criticized the Risk Committee and its members as incompetent,

6    inattentive, and ineffective, in addition to being unfamiliar with basic and critical concepts—like

7    the concept of "risk appetite" itself.

8      60.    SVB's internal audits also found serious deficiencies with the effectiveness of the

9    SVBFG and SVB's Boards of Directors and with SVBFG and SVB's risk management.

10      61.    For example, in March 2022, SVB's internal audit division issued a report that

11    rated "Corporate Governance-Board Oversight" as insufficient for the audit period September 1,

12    2020 through November 20, 2021. The report cited several serious deficiencies across all assessed

13    categories. These deficiencies included the following: (a) the lack of a formal framework for the

14    board to hold senior management accountable for risk-related events; (b) a lack of evidence to

15    support the so-called "effective challenge process;" (c) the risk and breach reporting was

16    voluminous and too granular; (d) insufficient time allotted to agenda topics and committee

17    meetings; (e) the lack of a framework for identifying necessary board training; and (f) a lack of

18    clear evidence aligning SVB's strategy to risk appetite.

19

20

**E.    Overconcentration in HTM Securities Obscures Losses, Prevents Hedging, and Restricts Liquidity**

21      62.    As explained above, the decision to invest in long-term government securities at

22    historically low interest rates exposed SVB to severe interest-rate risk because long-term

23    securities decline in value in a rising interest-rate environment and also generate less income

24    relative to a bank's deposit costs, which increase as rates rise and depositors expect a higher rate

25    of return on their interest-bearing accounts. The effect is to compress net interest margin,

26    resulting in reductions in capital, liquidity, and net income.

27      63.    Classifying most of SVB's investments as HTM rather than AFS obscured some of

28    the potential adverse consequences of this decision to principally invest in long-duration

- 14 -

securities. Under applicable accounting principles, AFS securities are recorded at "fair value" (they are "marked to market"), and changes in their value are reflected by the unrealized gains or losses reported in assets and shareholder's equity (as accumulated other comprehensive income) on the balance sheet.

64.    In contrast, HTM securities are not recorded at fair value but instead are carried at amortized cost. The accounting treatment for securities classified as HTM allowed SVB to exclude unrealized losses attributable to its HTM portfolio from assets and accumulated other comprehensive income as interest rates rose—the value of its HTM portfolio did not have to be reduced to fair value on the consolidated balance sheet for SVBFG and its subsidiaries despite drastic declines in the value of the portfolio. For example, SVB's unrealized losses in its HTM portfolio skyrocketed from $370 million to over $15.9 billion between September 30, 2021, and September 30, 2022.

65.    These accounting rules also prohibit hedging of HTM securities against interest-rate risk. In contrast, AFS securities can be hedged against interest-rate risk.

66.    Classifying the bulk of its securities as HTM limited SVB's ability to liquidate the securities. HTM securities cannot be sold before their maturity date without significant risk of tainting the HTM portfolio and having to reclassify the entire portfolio as AFS, which would result in having to recognize any unrealized loss in the portfolio. The effect of classifying securities as HTM accordingly limits access to these investments as a source of liquidity during times of financial stress. Applicable accounting principles specifically state that HTM securities cannot be sold in response to needs for liquidity such as withdrawal of deposits.

67.    SVB was an extreme outlier among its industry peers regarding the relative size of its HTM securities portfolio. Whereas peer banks on average had less than 10% of total assets classified as HTM, SVB had 46% of its total assets classified as HTM in 2021 and 43% of its total assets classified as HTM in 2022. This concentration was even more pronounced in SVB's securities portfolio, which was 78% HTM both at the end of 2021 and 2022 (as noted in the charts below). This massive overconcentration of long-duration HTM assets exposed the Bank to significant liquidity and interest-rate risk as rates increased in 2022.

1
2
3

      **F.**     **SVB's Officers and Directors Knew or Should Have Known of Substantial Interest-Rate and Liquidity Risks Facing SVB Yet Continued to Purchase Long-Term, Fixed-Rate Securities, Which Magnified its Overconcentration**

4
5

      68.     The Officer Defendants and the Finance and Risk Directors were well aware of a substantial risk of loss to SVB in the event of a rise in interest rates.

6
7
8
9
10
11
12
13
14
15
16
17

      69.     For example, a November 17, 2020 presentation to the Asset Liability Management Committee, entitled "Managing Exposure to Rising Rates," warned that continued investment in long-term securities "exposes the portfolio to risk of unrealized losses" and that SVB accordingly should reduce the duration of future investments and other assets to reduce the risk to SVB from an increase in interest rates above their historically low levels. From this presentation, the Officer Defendants on the committee were aware that SVB's securities portfolio had an average duration of 4.5 years with an average yield of 1.15% and that the committee should seek to reduce the duration of purchased securities to 3 years with an average yield of .75%. As part of this presentation, the committee also was informed that due to "the potential for interest rates to rise significantly and remain high," another supposed "risk mitigation strateg[y]" was to classify securities as HTM rather than AFS to avoid having to recognize unrealized losses on securities classified as AFS.

18
19
20
21
22
23
24
25
26
27

      70.     Similarly, in a January 20, 2021 memorandum to the Finance Committee, Treasurer Kruse reminded members of the committee that SVB had "experienced deposit growth well in excess of lending volume," that this growth had produced excess liquidity that could be invested, but that the duration of the investment portfolio should be between 3.5 to 4 years "so that cash flows are not as susceptible to changes in different rate environments" and to "[c]reate consistent, manageable cash flows." The Finance Committee was also advised that SVB's investment strategy should aim for an allocation of 50% to 60% HTM securities (leaving 40% to 50% in the AFS portfolio). These recommended limits tracked a plan developed by a third-party consultant, Blackrock, and were designed to manage the portfolio to enhance earnings while also reducing interest-rate risk and liquidity risks.

28

      71.     Over the next two years, the Officer Defendants and the Finance and Risk

COMPLAINT

Directors ignored these target durations for SVB's investment portfolio while continuing to expand its HTM portfolio to avoid recognizing unrealized losses from the decline in the value of its long-term securities that would have been recognized if the investments had been classified as AFS.

72.    As reported to the Asset Liability Management Committee and the Finance Committee, the effective duration of SVB's investment portfolio increased from year-end 2020 through year-end 2022 and exceeded the January 2021 target of 3.5 to 4 years in all quarters but one:

| Quarter Ending | Duration |
|---|---|
| Dec. 31, 2020 | 3.7 years |
| Mar. 31, 2021 | 4.8 years |
| June 30, 2021 | 4.5 years |
| Sep. 30, 2021 | 4.5 years |
| Dec. 31, 2021 | 4.0 years |
| Mar. 31, 2022 | 4.9 years |
| June 30, 2022. | 5.4 years |
| Sep. 30, 2022 | 5.7 years |
| Dec. 31, 2022 | 5.7 years |

73.    At the same time, the Officer Defendants and the Finance and Risk Directors caused SVB's ratio of HTM to AFS securities to increase well beyond the target of 50% to 60% of the securities portfolio designated as HTM:

| Quarter Ending | HTM Percentage of Investment Portfolio |
|---|---|
| Dec. 31, 2020 | 35% |
| Mar. 31, 2021 | 60% |
| June 30, 2021 | 72% |
| Sep. 30, 2021 | 78% |
| Dec. 31, 2021 | 78% |
| Mar. 31, 2022 | 78% |

- 17 -

COMPLAINT

| June 30, 2022 | 77% |
|---|---|
| Sep. 30, 2022 | 77% |
| Dec. 31, 2022 | 78% |

74.    The Officer Defendants and the Finance and Risk Directors took these steps—causing the duration of the investment portfolio and the size of the HTM portfolio to increase—to maximize yields in the portfolio (while interest rates remained low) while also attempting to avoid recognition of losses (when interest rates started to rise). This strategy allowed SVBFG to show increased profits in the short term and attempt to boost its stock price—all at the expense of taking on and ignoring obvious and substantial risks of significant losses to SVB as interest rates rose. The Officer Defendants and the Finance and Risk Directors knew or should have known, for example, that lengthening SVB's asset duration increased its interest-rate risk and that adding to SVB's HTM portfolio restricted its liquidity. Yet they ignored both risks for SVBFG's benefit, ultimately causing SVB substantial and foreseeable losses.

**G.    SVB's Officers and Directors Ignore Repeated Breaches of SVB's Risk Policies and Risk Thresholds**

75.    Investing in securities that lengthened the duration of SVB's investment portfolio when the portfolio was already significantly overconcentrated in long-term securities caused SVB to repeatedly breach its own risk-management policies and risk thresholds.

76.    SVB's Global Treasury Policy, as approved by the Finance Committee and Asset Liability Management Committee, mandated use of EVE-at-Risk as a primary metric for assessing and controlling interest-rate risk (referred to as "IRR"). EVE-at-Risk is a measure of the sensitivity to changes in interest rates of a firm's economic value of equity. Economic value of equity is calculated by subtracting the present value of all liability cash flows from the present value of all asset cash flows for an institution. EVE-at-Risk is calculated by determining an institution's economic value of equity in the event of a change in interest rates.

77.    In the case of SVBFG and SVB, their Global Treasury Policy set limits for changes in EVE-at-Risk at 8% (the inner limit) and 10% (the outer limit) in the event of a 1% change in interest rates (*i.e.*, 100 basis points) and at 16% (the inner limit) and 20% (the outer

1    limit) in the event of a 2% change in interest rates (*i.e.*, 200 basis points).

2        78.    If SVB breached or approached a breach of these limits, the Treasurer and

3    Treasury Department had a responsibility to develop and present a mitigation strategy that would

4    bring SVB back into compliance. Members of the Asset Liability Management Committee and

5    Finance Committee had a responsibility to review and approve that mitigation strategy.

6        79.    Despite these policy requirements, SVB regularly and materially exceeded the

7    inner and outer limits of EVE-at-Risk throughout 2021 and 2022 in rising-interest-rate scenarios

8    (*i.e.*, +100 basis points and +200 basis points). These breaches were an obvious consequence of

9    the decision to continue lengthening the duration of SVB's investment portfolio, since extending

10   asset duration relative to liability duration causes EVE-at-Risk to drop when interest rates rise.

11   Yet in response to these breaches, the Officer Defendants and the Finance and Risk Directors

12   took no action to correct the continuous and material breaches, disregarding the risks associated

13   with operating SVB inconsistent with its own risk policies and ignoring their responsibilities to

14   develop and approve a plan to bring SVB into compliance with its EVE-at-Risk limits. Instead,

15   the Officer Defendants and the Finance and Risk Directors continued to approve increased

16   investments in long-term securities that heightened SVB's exposure and risk to an increase in

17   interest rates.

18       80.    For example, an internal April 2021 Global Treasury Market Risk Report, which

19   was presented to the Finance Committee, stated that SVB's EVE-at-Risk as of February 28, 2021

20   was -13.48%, (if interest rates increased by 100 basis points) and -27.89% (if interest rates

21   increased by 200 basis points)—both of which far exceeded the acceptable risk limits in the

22   Global Treasury Policy. This presentation also recognized that the breaches resulted from

23   continued "grow[th] in long-duration fixed income securities."

24       81.    As another example, at a November 2021 meeting of the Asset Liability

25   Management Committee, Beck reported that SVB had "been out of compliance for EVE at risk

26   for several months" and asked what "additional actions should be taken," including increasing the

27   limits. Kruse responded that one way of improving EVE-at-Risk was to change the assumptions

28   used in SVB's deposit model. Thus, rather than mitigate the interest-rate risk by shortening asset

duration or taking other steps to correct the breaches, senior management proposed to alter their models measuring the risk so that the models no longer showed a breach. This is exactly what was done in April 2022, as discussed further below.

82.    SVB's EVE-at-Risk continued to breach the outer limits of the Global Treasury Policy in 2022. SVB's EVE-at-Risk breaches worsened further as the Federal Open Market Committee began to increase the federal funds target rate in March 2022, and by April 2022, materials presented to a joint meeting of the Finance Committee and Risk Committee showed that EVE-at-Risk was -16.92% (if interest rates increased by an additional 100 basis points) and -31.42% (if interest rates increased by an additional 200 basis points). Notwithstanding these worsening material breaches during a period when interest rates were rising and expected to rise further, the Officer Defendants and the Finance and Risk Directors continued to cause SVB to hold longer duration securities in its HTM portfolio, thereby exacerbating the breaches and further increasing the Bank's interest-rate risk.

**H.    SVB's Officers Altered the EVE-at-Risk Model Rather than Reducing Its Interest-Rate Risk**

83.    Rather than take steps to correct the EVE-at-Risk breaches or mitigate the interest-rate risk evidenced by those breaches, SVB's officers altered the deposit model that fed into the EVE-at-Risk model to try to make the breaches disappear.

84.    The planning for the deposit-model change began in 2021 when members of the Asset Liability Management Committee discussed the continuous and material breaches of EVE-at-Risk and possibly changing deposit assumptions to artificially lower EVE-at-Risk. Following these discussions, the Risk Committee was presented in January 2022 with a report providing for mitigation of interest-rate risk by "managing EVE sensitivity through deposit modeling." Specifically, the report provided for altering the deposit model's "curtailment assumption," which was characterized as the "overall time that deposits remained with the firm."

85.    As reported in a May 24, 2022 presentation to the Asset Liability Management Committee, SVB's officers implemented this plan by changing the curtailment assumption from 5.5 to 12 years. This change more than doubled the curtailment assumption—at a time of

heightened interest-rate risk due to actual and anticipated increases in interest rates—without any valid justification for the change. Given SVB's extraordinary deposit growth and the risky composition of those deposits, including the excessive number of uninsured deposits, the Officer Defendants and the Finance and Risk Directors knew or should have known that SVB's deposits were inherently susceptible to leaving the Bank (not "sticky").

86.     Ultimately, the change to the deposit model was made at Beck's insistence and without any objection from members of the Asset Liability Management Committee or the Risk Committee. SVB's officers and directors approved this change to try to "manage" a critical warning sign of serious risk—SVB's breach of its interest-rate-risk limits—rather than addressing the underlying risk itself.

87.     SVB's change to the deposit curtailment assumption brought EVE-at-Risk within the Global Treasury Policy's limits for only two months: April 2022 and May 2022. By June 2022 SVB was again in material breach—even using its altered model. Those breaches then continued throughout 2022 as reflected in the following chart:



COMPLAINT

I.      **Mismanagement of the HTM Portfolio Caused Billions in Damages**

88.    Throughout 2021, SVB purchased tens of billions of dollars of long-duration, fixed-interest-rate government securities at historically low interest rates, ignoring the obvious risk that interest rates could rise. In making or approving these purchases, the Officer Defendants and the Finance and Risk Directors breached their fiduciary duties of care and loyalty by causing SVB to operate in violation of its risk-management policies and metrics for the benefit of SVBFG.

89.    This mismanagement of SVB's investment portfolio was all the riskier because of the broadly reported macroeconomic environment during 2021, which was well understood by all Defendants. As inflation increased in 2021, Defendants were aware that there was at least a substantial risk that the Federal Open Market Committee would eventually respond by raising the federal funds target rate (the interest rate that banks charge each other to borrow money overnight). Those risks ultimately materialized.

90.    Following a December 15, 2021 meeting, the Federal Open Market Committee announced early termination of a bond-buying program and signaled the possibility of three interest-rate hikes in 2022 followed by three more in 2023.

91.    By the time of the April 2022 joint meeting of the Finance Committee and the Risk Committee, there already had been one rate hike, and members of these committees were advised to expect at least six more rate hikes in 2022 alone.

**Current Economic Environment:**
- The FOMC raised the Federal Funds rate by 25 bps to a new range of $0.25 - 0.50\%$, while also stating the Fed will begin reducing asset holdings at a "coming" meeting
- The updated Fed "Dots" now show a median projection of 7 rate hikes this year (6 after today's hike); market expectations for 50bps hike in May-22 now at 80%
- Hawkish tone from the Fed has caused the Treasury yield curve to invert, a key indicator that a

92.    Despite the likelihood of at least six more rate hikes and that EVE-at-Risk far exceeded the Bank's policy limits, the Officer Defendants and Finance and Risk Directors caused SVB to continue to hold $98 billion in excessively long-duration HTM securities. According to SVBFG and SVB's own models as of April 2022, the bank stood to lose 31.42% (nearly a third)

of its economic value of equity in the event of a 2% increase in interest rates (the actual increase after April 2022 turned out to be 4%), yet the Officer Defendants and Finance and Risk Directors continued to cause SVB to hold securities that had the effect of lengthening the duration of its investment portfolio.

93.    This investment strategy caused skyrocketing unrealized losses in the HTM portfolio as interest rates rose. As of March 31, 2022, SVB's unrealized HTM losses exceeded $7 billion, and as of September 30, 2022, they exceeded $15.9 billion. The following chart shows these losses (with values displayed in thousands, so "$(2,000,000)" refers to $2 billion in losses, for example):



94.    As of September 30, 2022, SVB had only $15.8 billion in total equity—less than the $15.9 billion in unrealized losses in its HTM portfolio alone. Had those losses been recognized, SVB would have been insolvent.

**J.    SVB Monetizes the Hedges on its AFS Portfolio to Benefit SVBFG**

95.    At the end of 2021, SVB's AFS portfolio was valued at $27 billion, roughly one-third the size of its HTM portfolio.

96.    Because the AFS portfolio had to be recorded at fair value, SVB hedged the portfolio using interest-rate swaps to mitigate reductions in accumulated other comprehensive

income in the event of a rise in interest rates. As part of its "Fair Value Hedging strategy," SVB entered into interest-rate swaps beginning in March 2021, and by November 2021 it had hedged $11.3 billion of its $24.2 billion AFS portfolio. This hedging had the effect of reducing the average duration of the AFS portfolio from 4.5 years to 2.5 years.

97.    The Officer Defendants and the Finance and Risk Directors knew that the purpose of the interest-rate swaps was to help protect SVB against the risk of rising interest rates and the detrimental impact on the value of the securities portfolio.

98.    The value of the interest-rate swaps increased, particularly as interest rates rose in 2022. Even though the interest-rate swaps reduced the duration of SVB's securities portfolio and protected the portfolio from the risk of an increase in interest rates, SVB began unwinding the swaps in 2021 and continued that unwinding throughout 2022 as rates were increasing and expected to continue to increase. By July 2022 the Officer Defendants and Finance and Risk Directors had caused SVB to terminate all but $564 million of the swaps.

99.    Terminating the interest-rate swaps ignored the obvious and substantial risk that SVB would incur large losses in its AFS portfolio if interest rates increased. The Officer Defendants and Finance and Risk Directors ignored this risk to realize short-term earnings that would benefit SVBFG by terminating the swaps that were put in place to protect against the risk of rising interest rates. Among other things, terminating the swaps produced gains that allowed SVBFG to hit earnings expectations of Wall Street analysts, thus supporting its stock price, and to show income that could be used to pay an imprudent dividend from SVB to SVBFG at the end of 2022.

100.    Beck, the Chief Financial Officer of SVBFG and SVB, explained the rationale for the removal of the hedges in a March 17, 2022 text to Dunbar, a Director and Chair of the Boards of Directors of SVBFG and SVB and a member of the Finance Committee and Risk Committee: "Just a quick head[s] up that we are unwinding today a part of our $10Bn hedging position—and selling $2Bn of Treasury securities—the rationale is that we have seen a major increase in short-term rates—and we have the opportunity to re-invest the Treasury positions at higher rates while *monetizing part of our $400MM hedging gain. As a result we will recognize close to $55MM of*

- 24 -

*gains on the swap unwinds and will improve net interest income by close to $19MM for the year.*"
(Emphasis added.)

101.    The Officer Defendants communicated extensively about the need for the AFS hedges and the decision to terminate them, including Becker, Beck, Izurieta, and members of the Asset Liability Management Committee (including Kruse, Beck, Descheneaux, Cadieux, and Izurieta). The Finance and Risk Directors also were kept informed of decisions to terminate and monetize the AFS interest rate hedges.

102.    In March 2022 the Officer Defendants and Finance and Risk Directors knew that (a) SVB had been in continuous material breach of the EVE-at-Risk limits in the Global Treasury Policy, (b) SVBFG and SVB's senior management had forecast an increase in short-term interest rates in 2022 of at least 2%, and (c) terminating the hedges on the AFS portfolio would lengthen rather than shorten asset duration, thereby exacerbating the risk that SVB would incur significant losses as interest rates continued to rise in accordance with management's own forecasts. Nevertheless, the Officer Defendants and Finance and Risk Directors mismanaged SVB's liquidity and interest-rate risk by monetizing these interest-rate hedges at a time of rising interest rates to provide short-term support for SVBFG's earnings and stock price.

**K.    SVBFG Plunders $294 Million From SVB Through an Improper Dividend**

103.    SVB historically had paid a "bank to parent" dividend to SVBFG. But in 2020 the dividend was suspended, and according to a presentation made during a March 2022 joint meeting of the Finance Committee and the Risk Committee, it was expected that the "bank-to-parent dividends would remain suspended through FY2023." Indeed, at this very same meeting, there was a discussion of the need to downstream $2.25 billion from SVBFG to SVB in 2022 and 2023 to improve SVB's leverage ratio.

104.    Nevertheless, within months of this meeting, the Officer Defendants (other than Izurieta) began to consider resuming the bank-to-parent dividend. Largely because of the monetization of the hedges discussed above, SVB had additional income that could potentially be used to pay a bank-to-parent dividend under SVB internal policies and regulatory requirements limiting the allowable amount of a dividend to a portion of net income.

105.    Both the Officer Defendants (other than Izurieta) and the Director Defendants (other than Dunbar) communicated internally about how this additional income could be used to benefit SVBFG. In addition to the bank-to-parent dividend, these Defendants considered using the income to pay dividends from SVBFG to its shareholders or to fund share repurchases that would increase SVBFG's stock price.

106.    In each case, Defendants (other than Izurieta and Dunbar) were considering an upstream of money to SVBFG to increase SVBFG's liquidity and meet its cash-flow needs while disregarding SVB's own needs for capital, liquidity, and adequate cash flow.

107.    Propping up SVBFG's share price was a particular concern. SVBFG's share price had fallen from an all-time high of $755.03 on November 3, 2021, to $335.51 on October 17, 2022. All Defendants owned SVBFG stock and in many cases were compensated with equity and bonuses linked to the performance of the stock. They accordingly had a direct interest in its price.

108.    The resumption of the bank-to-parent dividend was discussed at the October 18, 2022 Asset Liability Management Committee meeting where Kruse, Beck, and Descheneaux were in attendance. At that meeting, the committee approved recommending to the Finance Committee that the bank-to-parent dividend resume and that SVB pay a $294 million special dividend to SVBFG.

109.    Kruse delivered this recommendation in an October 19, 2022 memorandum to the Finance Committee. Justifications for paying the dividend in the memorandum included providing "a consistent flow of cash to the Holding Company" and "help[ing] support Parent liquidity."

110.    The October 19, 2022 memorandum reminded the Finance Committee that any dividend must "conform to State and Federal regulatory requirements," including that the "Bank is able to maintain policy limits and thresholds on all regulatory capital ratios post-dividend," in addition to having sufficient liquidity to meet customer needs.

111.    Neither this memorandum nor the Finance Committee minutes or other materials reflect any analysis or discussion of whether or how SVB could meet these and other requirements. Nor did the Finance Committee document any analysis or discussion of how this

- 26 -

dividend could be paid consistent with requirements of prudent banking and maintaining SVB's safety and soundness.

112.    Instead, the Officer Defendants (other than Izurieta) and the Director Defendants then on the Finance Committee ignored obvious and substantial risks to SVB associated with declaring this dividend. Among other things, members of the Finance Committee knew or should have known at this time that SVB had been breaching its EVE-at-Risk limits for over a year, that it was well outside those limits in an environment where interest rates were continuing to rise, that its deposit base lacked characteristics of "stickiness" that guard against deposit runs and protect liquidity, and that SVB had unrealized losses in its HTM portfolio exceeding the total value of its equity.

113.    In fact, at the same meeting where the Finance Committee evaluated the dividend, it received the results of a stress test showing breaches of its liquidity requirements in 30-day, 90-day, and 1-year stress scenarios because of large client outflows ($7 billion), a lack of alternative monetization channels, and higher interest rates that had resulted in market declines in the securities portfolio. The committee members also learned that "wholesale borrowings will continue to be the primary bridge until deposit growth returns." These liquidity concerns were in addition to no less than thirty-one open regulatory Matters Requiring Attention and Matters Requiring Immediate Attention, including Matters Requiring Immediate Attention related to liquidity risk management, weak risk management and oversight of liquidity, board ineffectiveness, and internal audit ineffectiveness.

114.    Disregarding the risks to SVB of plundering it of needed capital at a time of financial distress and management weakness, the Finance Committee (which, of course, was also the Finance Committee for SVBFG) approved the $294 million dividend to benefit SVBFG at the expense of SVB. A memorandum from Kruse to the Finance Committee stated that the purpose of the dividend was to help support liquidity at SVBFG. The Finance Committee's resolution approving the dividend required that the final amount of the dividend be determined and approved by the Chief Financial Officer or Treasurer of SVBFG. Members of the Finance Committee who approved this dividend were Friedman, Benhamou, Mitchell, and Miller.

115.    In addition to the members of the Finance Committee who voted to approve the dividend, the full Boards of Directors of SVBFG and SVB were notified of the intended dividend at their October 2022 combined meeting. Friedman reported that the Finance Committee had discussed the resumption of the payment of bank-to-parent dividends and that the Committee had "approved a dividend payment to be paid in the fourth quarter." All Director Defendants (other than Dunbar) attended this meeting. The minutes do not reflect any objection or other opposition to the dividend by these joint directors of SVBFG and SVB.

116.    The dividend was paid in late December 2022. By that time, SVB's liquidity position had only gotten worse. In advance of a November 2022 meeting, the SVBFG and SVB Boards of Directors were advised that management was then anticipating quarterly deposit outflows of at least $5 billion and that SVB was in breach of two key liquidity metrics. One of these metrics required that SVB have a 90-day net-liquidity position, as part of a stress test, greater than $5 billion (as an outer threshold), yet SVB's 90-day stressed position was *negative* $23 billion. The November 2022 board packet also reflected that management was considering a series of extraordinary "balance sheet management actions" to improve liquidity, including a one-time transfer of HTM securities to the AFS portfolio, progressive sales of AFS securities, share repurchases, and issuances of long-term debt.

117.    Similarly, on December 6, 2022, the Finance Committee expressed "concerns regarding the strength of the deposit base and the expected market competition for deposits going forward" and the "impact to balance sheet management and liquidity." In an Executive Summary, dated December 6, 2022, the Treasury Department updated the Finance Committee on various matters including "Liquidity Risk Management." In this regard, it noted that "[a]s of 10-31-2022, two key liquidity metrics . . . have breached thresholds."

118.    At the December 16, 2022 Risk Committee meeting, management advised the committee members that "market and liquidity risk profiles had increased materially over 2022, causing a deterioration of the Company's liquidity and market status, as evidenced by internal liquidity stress testing, resulting in [the Financial Risk Management Department] raising the risk profile rating to 'high' for both market and liquidity risk." Friedman, Benhamou, Daniels,

- 28 -

Matthews, Miller, and Mitchell were on the Risk Committee and attended the portion of the meeting where this information was presented. Despite the worsening financial conditions of SVB, there was no effort by any of the Director Defendants to reverse the decision to make the bank-to-parent dividend payment.

119.    Similarly, senior management made no effort to stop the bank-to-parent dividend and instead reaffirmed the decision to pay the dividend. For example, a December 21, 2022 presentation to the Finance Committee highlighted that SVB remained in breach of its liquidity metrics: "With higher than forecast deposit outflows, we have breached our Net Liquidity Position (NLP) metric. How do we stabilize our funding and mitigate our NLP breach?" Nonetheless, Beck replied that he was "good" with paying the dividend and had it paid out to SVBFG at the end of December 2022, just a few months before SVB was closed.

120.    Remarkably, on January 18, 2023, the Finance Committee approved an additional $200 million dividend from SVB to SVBFG despite the incredibly negative information it had received regarding SVB's breaches of its liquidity metrics and interest-rate-risk metrics. In this same meeting, the Finance Committee was presented with the economic forecast for 2023, showing an anticipated 23% decline in net income, expected earnings per share falling to $19.27 (versus $25.35 in 2022), and a 3.2% reduction in return on equity (dropping from 12.2% in 2022 to 9.0% in 2023). The Finance Committee was also informed that the Financial Risk Management Department continued to rate market risk as "high," based on the ongoing breaches of EVE-at-Risk limits and the challenge to remediate this breach by the end of 2023.

121.    SVB failed before this additional $200 million dividend could be paid to SVBFG.

## COUNT ONE: NEGLIGENCE

### (Against the Officer Defendants)

122.    The FDIC-R re-alleges Paragraphs 1 through 121 as if fully set out in this paragraph.

123.    As officers of SVB, each Officer Defendant owed SVB a duty to act or refrain from acting in a manner consistent with the diligence, care, and skill that ordinarily prudent persons would exercise under similar circumstances in the conduct of the Bank's business and

1    financial affairs, including, but not limited to, responsibilities to (a) avoid causing SVB

2    unnecessary risk of loss, (b) implement and oversee appropriate risk-management functions,

3    processes, and controls for the Bank, including those related to interest-rate and liquidity risk,

4    (c) manage SVB's risk-management and other business functions in accordance with the Bank's

5    policies and principles of prudent, safe, and sound banking, (d) obtain adequate information

6    before engaging in or approving transactions, and (e) appropriately and adequately supervise SVB

7    employees under their supervision and responsibility.

8         124.    The Officer Defendants breached and abdicated their duties to SVB through,

9    among other things, acts or omissions that unreasonably caused SVB to

10        (a)    Invest in and continue to hold long-term government securities, primarily in its

11              unhedged HTM portfolio, without regard to interest-rate risk metrics, like EVE-at-

12              Risk, thereby lengthening its asset duration and further exacerbating its exposure

13              to substantial losses in the event of an increase in interest rates; and

14        (b)    Terminate interest-rate swaps providing protection for its AFS portfolio from an

15              increase in interest rates, thereby lengthening SVB's asset duration and further

16              exacerbating its exposure to substantial losses in the event of an increase in interest

17              rates.

18        125.    The Officer Defendants, other than Izurieta, also breached and abdicated their

19    duties to SVB through, among other things, acts or omissions that unreasonably caused SVB to

20    pay SVBFG a $294 million dividend in December 2022 that deprived SVB of necessary capital

21    and liquidity at a time of significant financial distress.

22        126.    As a direct and proximate result of the Officer Defendants' breaches of the duty of

23    care, SVB incurred billions of dollars in damages in an amount to be proven. The Officer

24    Defendants' conduct was a substantial factor in causing these damages, and had they not breached

25    their duties to SVB, those losses would have been avoided.

26                          **COUNT TWO: GROSS NEGLIGENCE**

27                              **(Against All Defendants)**

28        127.    The FDIC-R re-alleges Paragraphs 1 through 121 as if fully set out in this

COMPLAINT

paragraph.

128.    Under 12 U.S.C. § 1821(k), officers and directors of an insured depository institution are personally liable for loss or damage caused by their gross negligence as defined and determined under applicable state law. California law defines gross negligence as either a want of scant care or an extreme departure from the ordinary standard of care.

129.    Each Defendant was grossly negligent in that his or her manner of carrying out his or her duties and responsibilities to the Bank constituted a want of scant care or an extreme departure from the ordinary standard of care as described in this Complaint.

130.    All Defendants engaged in grossly negligent conduct in numerous ways, including, but not limited to, the following:

(a)    Ignoring the obvious and substantial risk to SVB of a rise in interest rates by causing or allowing SVB to invest in and continue to hold long-term government securities, primarily in its unhedged HTM portfolio, at a time when it already was in material breach of its interest-rate risk metrics, like EVE-at-Risk, and thereby lengthening its asset duration and further exacerbating its exposure to substantial losses in the event of an increase in interest rates;

(b)    Ignoring the obvious and substantial risk to SVB of an increase in interest rates by causing SVB to terminate interest-rate swaps providing protection for its AFS portfolio from an increase in interest rates, thereby lengthening SVB's asset duration and further exacerbating its exposure to substantial losses in the event of an increase in interest rates; and

(c)    Ignoring the known and substantial risk to SVB of depriving it of necessary capital and liquidity, at a time of continuing rising interest rates and financial distress, by approving in October 2022 and then causing SVB to pay a $294 million dividend to SVBFG in December 2022.

131.    The Defendants who engaged in the grossly negligent conduct described in Paragraph 130(a)-(b) include Becker, Beck, Cadieux, Descheneaux, Kruse, Izurieta, Benhamou, Dunbar, Friedman, Miller, Mitchell, Matthews, and Staglin.

132.    The Defendants who engaged in the grossly negligent conduct described in Paragraph 130(c) include Becker, Beck, Cadieux, Descheneaux, Kruse, Benhamou, Friedman, Miller, Mitchell, Matthews, Staglin, Burr, Daniels, Davis, and Maggioncalda.

133.    As a direct and proximate result of Defendants' grossly negligent conduct, SVB incurred damages in an amount to be proven but that exceeds billions of dollars due to the conduct described in Paragraph 130(a)-(b) and at least $294 million due to the conduct described in Paragraph 130(c). Defendants' grossly negligent conduct was a substantial factor in causing these damages, and had they not engaged in this conduct, these losses would have been avoided.

## COUNT THREE: BREACH OF FIDUCIARY DUTY

### (Against All Defendants)

134.    The FDIC-R re-alleges Paragraphs 1 through 121 as if fully set out in this paragraph.

135.    Due to their positions, each Defendant had a fiduciary relationship with SVB and therefore owed fiduciary duties of care and loyalty to SVB.

136.    Each Defendant's fiduciary duty of care included, but was not limited to, acting as a prudent and diligent professional in conducting and monitoring the affairs of SVB.

137.    Each Defendant's fiduciary duty of loyalty included, but was not limited to, refusing to advance his or her own personal or business interests, or those of others, such as SVBFG, at the expense of SVB.

138.    All Defendants breached their fiduciary duties to SVB in numerous ways, including, but not limited to, the following:

(a)    Ignoring the obvious and substantial risk to SVB of a rise in interest rates by causing or allowing SVB to invest in and continue to hold long-term government securities, primarily in its unhedged HTM portfolio, at a time when it already was in breach of its interest-rate risk metrics, like EVE-at-Risk, and thereby lengthening its asset duration and further exacerbating its exposure to substantial losses in the event of an increase in interest rates, for the self-interested purposes (among others) of boosting SVBFG's short-term earnings and stock price;

(b)     Ignoring the obvious and substantial risk to SVB of an increase in interest rates by causing SVB to terminate interest-rate swaps providing protection for its AFS portfolio from an increase in interest rates, thereby lengthening SVB's asset duration and further exacerbating its exposure to substantial losses in the event of a rise in interest rates, for the self-interested purposes (among others) of boosting SVBFG's short-term earnings and stock price and purporting to enable SVB to pay a dividend to SVBFG; and

(c)     Ignoring the known and substantial risk to SVB of depriving it of necessary capital and liquidity, at a time of continuing rising interest rates and financial distress, by approving in October 2022 and then causing SVB to pay a $294 million dividend to SVBFG in December 2022.

139.    The Defendants who breached their fiduciary duties to SVB for the specific breaches set forth above in Paragraph 138(a)-(b) include Becker, Beck, Cadieux, Descheneaux, Kruse, Izurieta, Benhamou, Dunbar, Friedman, Miller, Mitchell, Matthews, and Staglin.

140.    The Defendants who breached their fiduciary duties to SVB for the specific breaches set forth above in Paragraph 138(c) include Becker, Beck, Cadieux, Descheneaux, Kruse, Benhamou, Friedman, Miller, Mitchell, Matthews, Staglin, Burr, Daniels, Davis, and Maggioncalda.

141.    The conduct described in Paragraph 138(a)-(c) breached fiduciary duties of care owed to SVB by exposing the Bank to obvious and substantial risks to its financial condition, operations, and safety and soundness, including obvious and substantial interest-rate, liquidity, and capital risks.

142.    The conduct described in Paragraph 138(a)-(c) breached fiduciary duties of loyalty to SVB by exposing the Bank to obvious and substantial risks to its financial condition, operations, and safety and soundness for the self-interested purpose (among others) of benefiting SVBFG at SVB's expense.

143.    Defendants' breaches of fiduciary duty violated and are actionable by the FDIC-R under applicable law, including the common law and, as to the Director Defendants, California

- 33 -

1    Corporations Code § 309.

2        144.    As a direct and proximate result of Defendants' breaches of fiduciary duty, SVB

3    incurred damages in an amount to be proven but that exceeds billions of dollars due to the

4    conduct described in Paragraph 138(a)-(b) and at least $294 million due to the conduct described

5    in Paragraph 138(c). Defendants' breaches were a substantial factor in causing these damages,

6    and had they not breached their fiduciary duties, these losses would have been avoided.

7    **RELIEF REQUESTED**

8        The FDIC-R requests that the Court enter a judgment against Defendants, jointly and

9    severally, for

10       A.    Actual damages in an amount to be proven;

11       B.    Prejudgment and post-judgment interest as allowed by law; and

12       C.    Such further relief allowed by law that the Court deems appropriate.

13   **DEMAND FOR JURY TRIAL**

14       The FDIC-R demands a jury trial.

15           /s/ _Stephen Sorensen_

16   Lynn R. Fiorentino (SBN 226691)    Stephen Sorensen (SBN 199408)
     44 Montgomery Street, 38th Floor    Elliot McGraw (SBN 275613)
17   ARENTFOX SCHIFF LLP    BAILEY GLASSER
     San Francisco, CA 94104    1055 Thomas Jefferson, Suite 540
18   Phone: 415-757-5500    Washington, DC 20007
     Email: lynn.fiorentino@afslaw.com    Phone: 202-463-2101
19       Email: ssorensen@baileyglasser.com
     Lawrence H. Heftman        emcgraw@baileyglassser.com
20   David C. Giles
     Michael K. Molzberger
21   (*pro hac vice* motions forthcoming)
     ARENTFOX SCHIFF LLP
22   233 S. Wacker Dr., Suite 7100
     Chicago, IL 60606
23   Phone: 312-258-500
     Email: lawrence.heftman@afslaw.com
24       david.giles@afslaw.com
         michael.molzberger@afslaw.com
25
     *Counsel to the Federal Deposit Insurance Corporation*
26   *as Receiver for Silicon Valley Bank*

27

28

COMPLAINT