1  Lorraine B. Echavarria (CA SBN 191860)          Michael A. Mugmon (CA SBN 251958)
   WILMER CUTLER PICKERING                         Caleb J. Lin (CA SBN 316869)
2     HALE AND DORR LLP                            WILMER CUTLER PICKERING
   350 South Grand Avenue, Suite 2400                 HALE AND DORR LLP
3  Los Angeles, CA 90071                           50 California Street, Suite 3600
   Telephone: (213) 443-5300                       San Francisco, CA 94111
4  Email: lori.echavarria@wilmerhale.com           Telephone: (628) 235-1000
                                                   Email: michael.mugmon@wilmerhale.com
5                                                  Email: caleb.lin@wilmerhale.com

6  Philip D. Anker (appearance pro hac vice)
   WILMER CUTLER PICKERING
7     HALE AND DORR LLP
   7 World Trade Center
8  250 Greenwich Street
   New York, NY 10007
9  Telephone: (212) 230-8800
   Email: philip.anker@wilmerhale.com

10 *Counsel for Defendants Eric Benhamou, Elizabeth Burr,*
11 *Richard Daniels, Alison Davis, Roger Dunbar, Joel*
   *Friedman, Jeffrey Maggioncalda, Beverly Kay Matthews,*
12 *Mary Miller, Kate Mitchell, and Garen Staglin*

13              **UNITED STATES DISTRICT COURT**
              **NORTHERN DISTRICT OF CALIFORNIA**
14                  **SAN JOSE DIVISION**

15 FEDERAL DEPOSIT INSURANCE            Case No. 5:25-cv-00569-NW
   CORPORATION AS RECEIVER FOR
16 SILICON VALLEY BANK,                 **OUTSIDE DIRECTORS' NOTICE OF**
                Plaintiff,              **MOTION TO DISMISS**
17                                      **FDIC-R'S COMPLAINT;**
        v.                             **MEMORANDUM OF POINTS AND**
18                                      **AUTHORITIES IN SUPPORT OF**
   GREGORY BECKER, DANIEL BECK,         **MOTION TO DISMISS**
19 MARC CADIEUX, MICHAEL
   DESCHENEAUX, MICHAEL KRUSE,          Date:         September 10, 2025
20 LAURA IZURIETA, ERIC BENHAMOU,       Time:         9:00 a.m.
   ROGER DUNBAR, JOEL FRIEDMAN,         Judge:        The Honorable Noël Wise
21 MARY MILLER, KATE MITCHELL,          Courtroom:    3, 5th Floor
   BEVERLY MATTHEWS, GAREN
22 STAGLIN, ELIZABETH BURR,
   RICHARD DANIELS, ALISON DAVIS,
23 AND JEFFREY MAGGIONCALDA,
                Defendants.
24

25

26

27

28

# **TABLE OF CONTENTS**

NOTICE OF MOTION ........................................................................................................... 1

ISSUES TO BE DECIDED ................................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES .......................................................... 2

I.     INTRODUCTION ......................................................................................................... 2

II.    BACKGROUND ........................................................................................................... 4

     A.    Silicon Valley Bank .................................................................................... 4

     B.    The HTM Portfolio .................................................................................... 5

     C.    The AFS Portfolio ...................................................................................... 7

     D.    The 2022 Dividend .................................................................................... 8

III.   LEGAL STANDARD .................................................................................................... 9

IV.   ARGUMENT ................................................................................................................ 9

     A.    Count Two Should Be Dismissed Because The Complaint Fails To Allege Any Facts Suggesting That The Directors Directed Or Approved The Transactions At Issue Without Engaging In Even "Scant Care." ..................................................... 10

          1.    Legal Background ........................................................................ 10

          2.    Gross Negligence ........................................................................ 12

          3.    The Complaint Fails To Allege That The Outside Directors Directed or Approved Investments In the HTM Portfolio, Or To Identify Any Deficiency In The Board's Processes As To Those Investments ............. 14

          4.    The Complaint Fails To Marshal Any Facts Establishing That The Outside Directors Authorized The Termination Of Any Hedges, Let Alone That They Did So Without Engaging In Any Diligence ................................ 15

          5.    The Complaint Does Not And Cannot Allege That The Outside Directors Approved The October 2022 Dividend Without Engaging In Any Diligence Or Process Or That The Dividend Reduced SVBFG's Ability To Act As A Source Of Strength For SVB ................................ 16

     B.    The Complaint Fails To Plead A Claim For Breach Of The Duty Of Care Under State Law Both Because The Board's Liability Was "Eliminated To The Fullest Extent Of California Law," And Because The Complaint Does Not Even Attempt To Plead A Violation Of California's Dividend Statute. ........................................ 17

          1.    The Bank's Articles Of Incorporation Eliminated All Liability Up To Intentional Misconduct Or Recklessness, and The Complaint Does Not Remotely Allege Such Misconduct. ........................................... 17

          2.    The FDIC-R's Claim That The Outside Directors Breached The Duties Of Care Or Loyalty By Approving The Dividend Also Fails For The Independent Reason That California's Statute Permitting The Payment Of A Dividend By A Solvent Company Covers The Field ............................ 19

C.    The Complaint Fails To Plead A Claim For Breach Of The Duty Of Loyalty Because The Interests Of SVB And Its Sole Shareholder, SVBFG, Were Aligned As A Matter Of Law ........................................................................................21

V.    CONCLUSION ...............................................................................................25

OUTSIDE DIRECTORS' MOT. TO DISMISS; MEMO ISO MOT. TO DISMISS
CASE NO. 5:25-cv-00569-NW

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)..................................................................................................9

*Atherton v. F.D.I.C.,*
  519 U.S. 213 (1997)................................................................................................10

*In re Bank of Am. Cal. Unemployment Benefits Litig.,*
  674 F. Supp. 3d 884 (S.D. Cal. 2023).....................................................................22

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007)..................................................................................................9

*F.D.I.C. v. Castetter,*
  184 F.3d 1040 (9th Cir. 1999) ..........................................................................10, 13

*F.D.I.C. v. Ching,*
  2014 WL 3361974 (E.D. Cal. July 8, 2014) ...........................................................20

*Copperweld Corp. v. Independence Tube Corp.,*
  467 U.S. 752 (1984)............................................................................................21, 22

*In re Diadexus, Inc.,*
  2019 WL 3412928 (N.D. Cal. July 29, 2019)..........................................................15

*West Virginia v. Environmental Protection Agency,*
  597 U.S. 697 (2022)................................................................................................24

*In re Facebook, Inc. S'holder Derivative Priv. Litig.,*
  367 F. Supp. 3d 1108 (N.D. Cal. 2019) ..................................................................11

*F.D.I.C. v. Faigin,*
  2013 WL 3389490 (C.D. Cal. July 8, 2013)...............................................11, 12, 13

*In re Jacks,*
  266 B.R. 728 (B.A.P. 9th Cir. 2001)........................................................................19

*F.D.I.C. v. Jamison,*
  2013 WL 1335606 (D. Ariz. Mar. 29, 2013) ............................................................9

*Metzler Inv. GmbH v. Corinthian Colls., Inc.,*
  540 F.3d 1049 (9th Cir. 2008) ..................................................................................5

iii

*Off'l Comm. of Bond Holders of Metricom, Inc. v. Derrickson*,
    2004 WL 2151336 (N.D. Cal. Feb. 25, 2004) ........................................................13

*Richardson v. Reliance Nat. Indem. Co.*,
    2000 WL 284211 (N.D. Cal. Mar. 9, 2000).............................................................22

*SVB Financial Trust v. Federal Deposit Insurance Corp., as Receiver for Silicon Valley Bank*,
    Case No. 5:24-cv-01321-BLF (N.D. Cal.)..................................................... *passim*

*SVB Financial Trust v. Federal Deposit Insurance Corp*,
    Case No. 23-cv-06543-BLF (N.D. Cal.)......................................................... *passim*

*In re Sybase, Inc. Sec. Litig.*,
    48 F. Supp. 2d 958 (N.D. Cal. 1999) ......................................................................3

*In re Verifone Holdings, Inc. Shareholder Deriv. Litig.*,
    2009 WL 1458233 (N.D. Cal. May 26, 2009) .......................................................19

**State Cases**

*Anadarko Petroleum Corp. v. Panhandle Eastern Corp.*,
    545 A.2d 1171 (Del. 1988) ...................................................................................22

*Asahi Kasei Pharma Corp. v. CoTherix, Inc.*,
    204 Cal. App. 4th 1 (2012) ........................................................................4, 21, 22

*Berg & Berg Enterprises, LLC v. Boyle*,
    178 Cal. App. 4th 1020 (Cal. Ct. App. 2009) ......................................................10

*Brehm v. Eisner*,
    746 A.2d 244 (Del. 2000) .....................................................................................13

*Brown v. El Dorado Union High School Dist.*,
    76 Cal. App. 5th 1003 (Cal. Ct. App. 2022) ..............................................13, 14, 16

*Burt v. Irvine Co.*,
    237 Cal. App. 2d 828 (Cal. Ct. App. 1965) .........................................................11

*In re Caremark Intern., Inc. Deriv. Litig.*,
    698 A.2d 959 (1996) .............................................................................................18

*Copesky v. Superior Court*,
    229 Cal. App. 3d 678 (Cal. Ct. App. 1991) .........................................................22

*Kanter v. Reed*,
    92 Cal. App. 5th 191 (Cal. Ct. App. 2023) ................................................. *passim*

iv

*Katz v. Chevron Corp.*,
22 Cal. App. 4th 1352 (Cal. Ct. App. 1994) ...........................................................10

*In re Oracle Corp.*,
867 A.2d 904 (Del. Ch. 2004) .............................................................................18

*PMC, Inc. v. Kadisha*,
78 Cal. App. 4th 1368 (Cal. Ct. App. 2000) ...........................................................12

*Rosencrans v. Dover Images, Ltd.*,
192 Cal. App. 4th 1072 (Cal. Ct. App. 2011) ..........................................................12

*Trenwick Am. Litig. Trust v. Ernst & Young, L.L..P*,
906 A.2d 168 (Del. Ch. 2006) .........................................................................13, 14

**Federal Statutes and Rules**

12 U.S.C. § 1821(k) ...........................................................................................12

Federal Rule of Civil Procedure 12(b)(6) .................................................................1

**State Statutes**

Cal. Corp. Code § 166 .........................................................................................19

Cal. Corp. Code § 204(a)(10) .........................................................................11, 18

Cal. Corp. Code § 309 ...................................................................................*passim*

Cal. Corp. Code § 500 .........................................................................................19

Cal. Corp. Code § 501 .........................................................................................19

**Regulations**

88 Fed. Reg. 70391 ............................................................................................23

**Other Authorities**

Society for Corporate Governance, Comment to FDIC .........................................23, 24

Conference of State Bank Supervisors, Comment to FDIC ........................................24

M. Stratford, *Embattled FDIC Chair Gruenberg says he will resign Jan. 19*,
Politico (Nov. 19, 2024) .......................................................................................2

Martin Gruenberg, *Three Financial Crises and Lessons for the Future*,
Brooking Institution (Jan. 14, 2025) ........................................................................2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION**

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on September 10, 2025, at 9:00 a.m. or as soon thereafter as the matter may be heard, in the Courtroom of The Honorable Noël Wise, 45280 South First Street, San Jose, California 95113, Defendants Eric A. Benhamou, Elizabeth Burr, Richard D. Daniels, Alison Davis, Roger F. Dunbar, Joel P. Friedman, Jeffrey N. Maggioncalda, Beverly Kay Matthews, Mary J. Miller, Kate D. Mitchell, and Garen K. Staglin (the "Outside Directors") will move to dismiss the Complaint [ECF No. 1] of the Federal Deposit Insurance Corporation ("FDIC") as Receiver for Silicon Valley Bank ("SVB" or the "Bank").

The Outside Directors move to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on the ground that the Complaint fails to state a claim against them. Defendants' motion is based on this Notice of Motion and Memorandum of Points and Authorities, the accompanying Declaration of Philip D. Anker ("Anker Decl.") and Request for Judicial Notice, the pleadings and records in this action, the argument of counsel, and any other matters that may be presented to the Court.

**ISSUES TO BE DECIDED**

1.      Whether Plaintiff's gross-negligence claim should be dismissed for failure to plead facts plausibly alleging that the Outside Directors acted with less than even "scant care" or in an "extreme departure from the ordinary standard of care?"

2.      Whether Plaintiff's claim for breach of the duty of care should be dismissed for failing to plead facts showing that the Outside Directors acted recklessly and for failing to plead a claim for violation of the California statute that regulates the payment of corporate dividends?

3.      Whether Plaintiff's claim for breach of the duty of loyalty should be dismissed because, as matter of law, the interests of SVB and its sole shareholder, SVB Financial Group ("SVBFG"), were aligned, such that the Outside Directors could not have breached a duty of loyalty to SVB by acting in what they perceived to be the best interests of both SVB and SVBFG?

1

2

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

3

4

This lawsuit should never have been filed.  The Complaint is supported by no well-pleaded allegations of fact as to the Outside Directors.  It reflects a rush to judgment by the FDIC, driven by the then-Chairman of the FDIC as he was leaving office and animated by other matters that are not before this Court and that are divorced from the "merits" of the claims.

5

6

7

8

9

10

11

12

13

SVB was placed into receivership in March 2023 after its customers sought to withdraw approximately 80% of the funds they had on deposit in a matter of 48 hours. That "run on the bank," fueled by social media, was unprecedented both in its speed and extent, and no regulator predicted that it would occur.  The run followed a period of a little over a year in which the Federal Reserve had repeatedly and dramatically raised interest rates, from 0.25% to nearly 5.0%. As the FDIC's own Chairman has publicly admitted, the banking regulators failed contemporaneously to "identify and address" the unparalleled events that ultimately led to SVB's receivership.[1]

14

15

16

17

18

19

20

21

Indeed, it was not until January of this year—on the eve of the effective date of the Chairman's resignation,[2] and when the FDIC was forced to respond to the claims brought in separate litigation by a bankruptcy trust acting for the benefit of the creditors of its former holding company, SVBFG (the "SVBFG Trust")[3]—that the FDIC decided to sue the Outside Directors. Within a matter of days after it filed its answer in that lawsuit, in which the SVBFG Trust seeks to recover some $1.9 billion that SVBFG had on deposit at SVB at the time the Bank went into receivership, the FDIC cut and pasted its defenses to the SVBFG Trust's claims into the complaint it filed against the Outside Directors commencing this action.  That this suit, brought against a

22

23

24

25

[1] Martin Gruenberg, *Three Financial Crises and Lessons for the Future*, Brooking Inst. (Jan. 14, 2025) (stating that the risks facing SVB and other leading banks that went into receivership in the Spring of 2023 were "poorly understood" at the time, including by regulators whose "failures of supervision and regulation to identify and address those risks . . . in some cases exacerbate[ed] them").

26

[2] *See* M. Stratford, *Embattled FDIC Chair Gruenberg says he will resign Jan. 19*, Politico (Nov. 19, 2024), *available at* https://www.politico.com/news/2024/11/19/fdics-gruenberg-says-he-will-resign-jan-19-00190373.

27

[3] *SVB Fin. Tr, v. Fed. Deposit Ins. Corp*, Case No. 23-cv-06543-BLF (N.D. Cal.); *SVB Financial Tr. v. Fed. Deposit Ins. Corp., as SVB*, Case No. 5:24-cv-01321-BLF (N.D. Cal.).

28

series of individuals who (even if the claims had any basis) could never satisfy the multi-billion-dollar judgment the FDIC purports to seek, is a political and tactical maneuver involving other matters is plain.

That the suit lacks merit is also evident.  The Complaint is devoid of relevant facts and is contrary to settled law.  The FDIC "cannot prevail . . . by simply second-guessing [the Outside Directors' conduct] with the benefit of 20–20 hindsight."  *In re Sybase, Inc. Sec. Litig.*, 48 F. Supp. 2d 958, 963 (N.D. Cal. 1999).  The Complaint fails to state a claim and should be dismissed.

*First*, as to all but one of the transactions at issue (SVB's payment of a $294 million dividend to SVBFG that a committee of SVB's board of directors (the "Board") approved in October 2022 ("Dividend")), the Complaint fails to allege a single fact suggesting that any of the Outside Directors authorized or otherwise "caused" the transactions to occur, as would be required for the FDIC to plead a claim of "gross negligence."  And even if the Complaint contained well-pleaded facts so alleging, it contains no allegations at all regarding the Outside Directors' deliberations, let alone facts suggesting that the Outside Directors were not diligent at all and, indeed, were utterly indifferent to SVB's fate, as would also be required for a claim of gross negligence.  To the contrary, the Complaint concedes that Outside Directors consulted with, questioned, and relied upon the expertise of the Bank's management and leading consultants in the course of their duties, just as the law entitled them to do.

*Second*, the claim for breach of the duty of care fails because the law of California, where SVB was chartered, and SVB's Articles of Incorporation exculpated the Outside Directors unless the Outside Directors were "reckless," a legal standard that is even more demanding than gross negligence and that the Complaint does not remotely allege.  And, as to the Dividend, the FDIC fails even to try to plead a violation of the California Corporation Code, which provides the sole avenue for director liability based on declaring a corporate dividend.

*Third*, the claim for breach of the duty of loyalty fails for an even more basic reason.  The claim is premised on the notion that the Outside Directors, who served on the Boards of both SVB and SVBFG, had a conflict as a result and were required to promote the interests of only the former.

That is simply wrong.  In keeping with one of the most basic principles of corporate law throughout the nation, California requires that a director of a corporation perform his or her duties "in a manner such director believes to be in the best interests of the corporation *and its shareholders*."  Cal. Corp. Code § 309 (emphasis added).  That rule has special force where, as here, the company (SVB) has a single shareholder, its parent (SVBFG) and the subsidiary is, by far, the overwhelming asset of the parent.  "A parent and its wholly owned subsidiary have a complete unity of interest." *Asahi Kasei Pharma Corp. v. CoTherix, Inc.*, 204 Cal. App. 4th 1, 10 (2012) (internal quotation marks omitted).  If the FDIC wishes to try to preempt this foundational element of state corporate law and preclude the same persons from serving on the boards of both a bank and its holding company, it may seek to adopt new regulations or it may petition Congress.  But it cannot simply, by fiat, make the changes it desires retroactively through this litigation, holding the Outside Directors liable for doing exactly what the law allowed them to do then (and now)—to serve on the Boards of SVB and SVBFG and act in what they perceived to be the best interests of both.

## II.    BACKGROUND

Stripped of its inflammatory rhetoric, the FDIC's claims concern three, and only three, sets of transactions: (1) SVB's investment in 2021 of a portion of its customer deposits in a portfolio of long-term, fixed-rate notes that the Bank intended to hold to maturity ("HTM")—i.e., until the notes came due; (2) SVB's termination in 2021 and 2022 of certain "hedges," designed to protect against fluctuations in interest rates, on a different part of the Bank's portfolio, consisting of securities that were available for sale ("AFS"); and (3) the declaration in October 2022 of the $294 million Dividend paid later that year to SVB's sole shareholder, SVBFG. Compl. ¶¶ 3–5.

### A.    Silicon Valley Bank

SVB was founded in 1983 in the heart of Silicon Valley as a subsidiary of SVBFG.  It served some of the largest "venture-capital-backed companies" in the "technology and life-sciences sectors."  Compl. ¶¶ 31, 44.  From 2019 through 2021, SVB prospered, "tripl[ing]" in size. *Id.* ¶¶ 41–43.  But, on March 9, 2023, following a year-long, extraordinary series of increases in interest rates by the Federal Reserve and prompted by an unprecedented social-media rumor

mill, SVB depositors withdrew $40 billion in a single day.  SVB informed bank regulators that it expected a further $100 billion in deposit outflows the next day.  The California Department of Financial Protection immediately closed SVB and placed it in FDIC receivership.  *Id.*  ¶ 7.

The Complaint alleges that for many years leading up to its receivership, the directors of SVB also served as the directors of SVBFG, and that the directors of the parent and the subsidiary held joint Board meetings.  *Id*. ¶¶ 33–34.  But what is most telling is what the Complaint does not (and cannot) allege: that this "overlap[]" (*id.* ¶ 34) in the Boards of SVB and SVBFG was at all unusual in the banking world or that any regulator ever raised any concern about the overlap.  The Boards of both SVB and SVBFG consisted of 12 individuals, the CEO of the Bank and the holding company (Gregory Becker) and 11 other, well-regarded figures from the world of banking, venture capital, government regulation, and the like (the Outside Directors).[4]   None of those Outside Directors was an officer or employee of either SVB or SVBFG (the Outside Directors).  *Id.* ¶¶ 8, 14–27.  Many of those Outside Directors had long served on the Board of SVB, as it grew and prospered, in some cases dating all the way back to 2005.  *Id.* ¶¶ 14–24.

### B.    The HTM Portfolio

The Complaint acknowledges that SVB did exceptionally well from 2018 to 2021, growing substantially and increasing the value of its "equity" (the difference in value between its assets and its deposit and other liabilities) by tens of billions of dollars. Compl. ¶¶ 41–43.  The Complaint also acknowledges that, rather than engage in speculation, SVB invested "the bulk of this surge in deposits" in perhaps the safest class of securities—"fixed-rate, government-backed debt securities, such as U.S. treasuries and mortgage-backed securities"—with the goal of generating "relatively modest income," reflecting the difference between the rate of interest SVB earned on those

---

[4] *See* Anker Decl., Ex. 8, SVBFG Schedule 14A Proxy Statement at 15–20.  All referenced exhibits are attached to the Anker Declaration and, as discussed in the accompanying Request for Judicial Notice, are subject to judicial notice and/or incorporated by reference in the Complaint. The Court may consider matters subject to judicial notice or incorporated by reference in the Complaint.  *See Metzler Inv. GmbH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008).

securities and the rate of interest the Bank paid its depositors. *Id.* ¶¶ 47–48. The Complaint does not allege that SVB ever experienced a single default on any of the securities it purchased.

Instead, the FDIC criticizes SVB for investing as large a portion of its portfolio as it did in such safe fixed-rate notes and designating those investments for inclusion in its HTM portfolio. But, as with much of the Complaint, this amounts to little more than an after-the-fact attack on the legal (or, in this case, accounting) principles that applied when the relevant events occurred. As the FDIC acknowledges, the applicable accounting rules (known as Generally Accepted Accounting Principles or "GAAP") in effect then (and now) in the United States required SVB, and every other bank or other business, to account for its HTM portfolio on its balance sheet without reassessing its trading value periodically based on fluctuations in market rates of interest, precisely because the investments were intended to be held to maturity; indeed, for the same reason, GAAP "prohibit[ed]" any "hedging of HTM securities against interest-rate risk." *Id.* ¶¶ 64–65. In any event, as part of its regular, publicly-available SEC filings, SVB in fact *did* prominently and consistently disclose the market value of the HTM portfolio. *See* Anker Decl., Ex. 3, SVBFG 2022 Form 10-K, at 127; *id.*, Ex. 6, SVBFG Q3 2022 10-Q, at 17.

The Complaint suggests that, over time, SVB exceeded internal recommendations regarding its HTM portfolio, but it fails to allege any fact purporting to show that the Outside Directors approved or otherwise participated in any supposed decision to exceed those recommendations. In particular, the Complaint alleges that, in January 2021, an officer delivered a memorandum to the Finance Committee of the SVB Board providing "recommended limits" for the HTM portfolio that the Bank was developing—both in the allocation of the portfolio devoted to HTM as compared to AFS (between 50% and 60%) and the duration of the debt securities invested in the HTM portfolio (between 3.5 to 4 years). *Id.* ¶ 70. The Complaint alleges that these recommendations "tracked a plan developed by a third-party consultant, Blackrock." *Id.* Thereafter, the Bank's allocation and duration of its HTM portfolio allegedly exceeded those recommendations. *Id.* ¶¶ 72–73. But, aside from the legally insufficient *conclusion* that the Outside Directors sitting on SVB's Finance and Risk Committee and the Officer Defendants all

jointly "cause[d]" these supposed deviations (*id.* ¶ 82), the Complaint nowhere alleges any *facts* suggesting that any of the Outside Directors ever were asked to, or did, direct or approve any of the investments SVB made over time.

Moreover, nowhere does the Complaint allege that the Outside Directors failed to hold meetings concerning, or neglected to consider and question, the recommendations that the Bank's financial management team and consultants provided regarding the overall structure of the Bank's portfolio. Indeed, the only non-conclusory fact the Complaint alleges with respect to the Outside Directors' involvement with the HTM portfolio concerns the January 2021 memorandum to the Finance Committee, discussed above, a document that shows that the Outside Directors *did* hold meetings and consider management's recommendations regarding the portfolio. *Id.* ¶ 70.

### C.    The AFS Portfolio

According to the Complaint, in 2021 and 2022 SVB removed certain hedges on its separate AFS portfolio. But, in support of any claim against the Outside Directors relating to the removal of those hedges, the Complaint merely makes the conclusory (and improper group-pleading) assertion that the seven Outside Directors who were at the time on the Finance or Risk Committees of the Board, together with the six Officer Defendants, all jointly "caused" SVB to terminate these hedges. Compl. ¶ 4. Again, this legally insufficient *conclusion* is unsupported by even a single well-pleaded *fact* as to any of the Outside Directors.

To the contrary, the only specific factual allegation tying any of the Outside Directors to the removal of any hedge is that one of the Officer Defendants gave a single Outside Director a "head[s] up that we are unwinding today part of our $10Bn hedging position." *Id.* ¶ 100. The Complaint does not allege that the Outside Director was asked on this or any other occasion to approve, or did approve, the unwinding of any hedge. Indeed, while the Complaint includes the vague assertion that, along with the Officer Defendants, the "Finance and Risk Directors also were kept informed of decisions to terminate and monetize the AFS interest rate hedges," *id.* ¶ 101, it provides no examples (other than the one, after-the-fact "heads up" to the single Outside Director) and includes not a word to suggest that the question whether any hedge should be removed ever

came before the Board for approval.  And, even if the Complaint could be read otherwise, it (again) says absolutely nothing about the process the Outside Directors undertook (or supposedly failed to undertake) in considering the AFS portfolio and any hedges.

### D.    The 2022 Dividend

Finally, the Complaint alleges that, in October 2022, the Bank's officers recommended, and the Finance Committee of the Board approved, the Dividend of $294 million to SVBFG, which SVB paid in December 2022.  *Id.* ¶¶ 108–10, 114.  The Complaint does not allege that the Bank was insolvent when SVB declared this Dividend.  To the contrary, the Complaint acknowledges that, at the time, SVB accounted for nearly 99% of the total assets of SVBFG (*id.* ¶ 32) and that SVBFG's stock, while down from a year earlier, was still trading at $335.51 per share (*id.* ¶ 107), meaning that the company's market capitalization (the aggregate market value of its outstanding stock) remained in the many billions of dollars.[5]

The Complaint asserts that SVBFG was meant to serve as a "source of strength" to SVB, *id.* ¶ 5, but it nowhere explains how ensuring that SVBFG had greater liquidity (the $294 million that the Dividend provided to SVBFG) could undermine, rather than enhance, SVBFG's ability to fulfill that role.  In fact, the Complaint acknowledges that SVB paid the Dividend precisely to enhance SVBFG's liquidity.  *Id.* ¶¶ 109, 114, 118.

In any event, the Complaint concedes that the Outside Directors on the Finance Committee relied upon the advice of SVB's management that SVB could pay the Dividend and remain in compliance with all applicable regulations.  *Id.* ¶¶ 110, 114.  The Complaint does not (and cannot) allege that SVB kept its plans to pay this Dividend secret or that any regulator raised the slightest objection.  The amount of the Dividend—$294 million—paled in comparison to the approximately $2 billion that SVBFG continued to maintain on deposit at SVB after it received the Dividend.

---

[5] As of September 30, 2022, SVBFG had 59,104,124 shares outstanding and as of October 20, 2022, SVBFG still had 59,104,124 shares outstanding, *see* Anker Decl., Ex. 6, SVBFG Q3 2022 10-Q at 4; *id.*, Ex. 7, SVBFG Oct. 20, 2022 8-K at 15; accordingly, SVBFG's market capitalization, which represented the market's assessment of the value of the company's common stock, was nearly $20 billion (59,104,124 shares × $335.31 per share = $19,818,203,818.40).

1   *See SVB Fin. Tr. v. Fed. Deposit Ins. Corp., as Receiver for SVB*, Case No. 5:24-cv-01321-BLF

2   (N.D. Cal.), Dkt. No. 135, Answer of FDIC, ¶ 67; *see also SVB Fin. Tr. v. Fed. Deposit Ins. Corp.*,

3   Case No. 5:23-cv-06543-BLF (N.D. Cal.), Dkt. No. 130, CMC Statement, at 2.

### III.    LEGAL STANDARD

5       "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to

6   relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) (citation

7   omitted).  While the Court must accept well-pleaded facts, it need not accept "legal conclusions"

8   or "[t]hreadbare recitals of the elements of a cause of action [] supported by mere conclusory

9   statements." *Id.* at 678–79.  As Judge Freeman noted in a recent order denying a motion to dismiss

10  in the SVBFG Trust's litigation against the FDIC in its corporate capacity, "the Court need not

11  'accept as true . . . allegations that are merely conclusory, unwarranted deductions of fact, or

12  unreasonable inferences.'" *SVB Fin. Tr. v. Fed. Dep. Ins. Corp*, Case No. 23-cv-06543-BLF, Dkt.

13  No. 162, at 5 (Feb. 27, 2025, N.D. Cal.), *quoting In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049,

14  1055 (9th Cir. 2008).

15      Allegations in the complaint "must be enough to raise a right to relief above the speculative

16  level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  In particular, the FDIC must

17  plead "specific factual instances of Defendants' breach of their duties of care and loyalty [] and

18  their gross negligence" to survive a 12(b)(6) motion to dismiss.  *F.D.I.C. v. Jamison*, 2013 WL

19  1335606 at *5 (D. Ariz. Mar. 29, 2013).  It has not.

### IV.    ARGUMENT

21      The Court should dismiss the Complaint in its entirety as to the Outside Directors both

22  because the FDIC has failed to plead facts that could plausibly support a claim that the Outside

23  Directors were grossly negligent or otherwise breached a duty of care and because the Trust's duty

24  of care and duty loyalty claims are contrary to applicable law.   Point A below addresses the

25  Complaint's failure to state a claim for gross negligence (Count Two).  Point B explains why the

26  FDIC's duty-of-care claims (Count Three) fail.  Finally, Point C explains why the FDIC's duty-

27  of-loyalty claims (also Count Three) likewise fail as a matter of law.

28

**A.    Count Two Should Be Dismissed Because The Complaint Fails To Allege Any Facts Suggesting That The Directors Directed Or Approved The Transactions At Issue Without Engaging In Even "Scant Care."**

The Complaint does not remotely state a claim for gross negligence against the Outside Directors.  To appreciate why, it is important first to consider why the FDIC is constrained to try to assert a claim for gross (rather than ordinary) negligence against the Outside Directors, and the substantial differences in the legal standards applicable to claims of gross and ordinary negligence.

**1.    Legal Background**

In Count One, the FDIC asserts a claim against the Officer Defendants—but not the Outside Directors—for ordinary negligence.  The Outside Directors are conspicuously absent from that Count: the only claim sounding in negligence that the FDIC asserts against the Outside Directors is, instead, for *gross* negligence in Count Two.  As the FDIC evidently recognizes, the law would not permit a claim for ordinary negligence against the Outside Directors.  This is so for two reasons.

*First*, California recognizes the "business-judgment rule"—the presumption that, in the absence of bad faith or a legally-cognizable conflict of interests, the decisions of a corporation's directors reflect sound business judgment that cannot be second-guessed.[6]  *Berg & Berg Enterprises, LLC v. Boyle*, 178 Cal. App. 4th 1020, 1045 (Cal. Ct. App. 2009) (California's business-judgment rule "establishes a presumption that directors' decisions are based on sound business judgment, and . . .  prohibits courts from interfering in business decisions made by the directors in good faith and in the absence of a conflict of interest").  As a result, any claim of director liability must be "*predicated upon concepts of gross negligence*."  *Katz v. Chevron Corp.*, 22 Cal. App. 4th 1352, 1366 (Cal. Ct. App. 1994) (emphasis added).  Consequently, the FDIC cannot allege ordinary negligence against the Outside Directors: the presumption that they

---

[6] Because SVB was chartered in California, its law governs any claims relating to its "internal affairs," such as the oversight provided by its Board.  The FDIC so acknowledges.  Compl. ¶ 128; *see also F.D.I.C. v. Castetter*, 184 F.3d 1040, 1043 (9th Cir. 1999); *Atherton v. F.D.I.C.*, 519 U.S. 213, 215–16 (1997)).

10

exercised sound business judgment, or "reasonable diligence," *Burt v. Irvine Co.*, 237 Cal. App. 2d 828, 852–53 (Cal. Ct. App. 1965), in and of itself, would bar such a claim.

*Second*, California allows a company in its articles of incorporation to "eliminate[]" a director's liability for monetary damages, other than for a few extraordinary categories of conduct, sounding in intentional misconduct or at least recklessness, *viz.*:

> (i) for acts or omissions that involve intentional misconduct or a knowing and culpable violation of law, (ii) for acts or omissions that a director believes to be contrary to the best interests of the corporation or its shareholders or that involve the absence of good faith on the part of the director, (iii) for any transaction from which a director derived an improper personal benefit, (iv) for acts or omissions that show a reckless disregard for the director's duty to the corporation or its shareholders in circumstances in which the director was aware, or should have been aware, in the ordinary course of performing a director's duties, of a risk of serious injury to the corporation or its shareholders, (v) for acts or omissions that constitute an unexcused pattern of inattention that amounts to an abdication of the director's duty to the corporation or its shareholders . . . ."

Cal. Corp. Code § 204(a)(10).

SVB's Articles of Incorporation eliminated all liability that the Outside Directors might incur "to the fullest extent of California law."[7]  In turn, as noted, California permits exculpation of directors for all but recklessness or intentional misconduct, both of which carry an even *higher* pleading standard than gross negligence.  *Compare Kanter v. Reed*, 92 Cal. App. 5th 191, 208 (Cal. Ct. App. 2023) (defining "reckless disregard" as an "intentional act or intentional fail[ure] to act in accordance with [a director's] duties, (2) with knowledge, or with reason to have knowledge, that (3) the director's conduct creates a substantial risk of serious harm to the corporation or its shareholders") *with F.D.I.C. v. Faigin*, 2013 WL 3389490, at *8 (C.D. Cal. July 8, 2013) ("gross negligence" is a "want of even scant care").

To be sure, Congress chose to override state law to the extent that it would otherwise permit the exculpation of bank directors for gross negligence, but it chose to allow state law to govern

---

[7] *See* Anker Decl., Ex. 16, SVBFG's Articles of Incorporation § 4 (June 29, 1988).  The FDIC does not allege otherwise, and this Court may take judicial notice of the Articles of Incorporation, as a public record, the authenticity of which cannot be disputed.  *See In re Facebook, Inc. S'holder Derivative Priv. Litig.*, 367 F. Supp. 3d 1108, 1118 (N.D. Cal. 2019) ("Courts routinely consider a company's certificate of incorporation and bylaws in assessing a motion to dismiss a derivative suit").

1    where, as here, that law would bar a claim for ordinary negligence.  *See* 12 U.S.C. § 1821(k) ("A

2    director . . . of an insured depository institution may be held personally liable for monetary

3    damages in any civil action by, on behalf of, or at the request or direction of the [FDIC] . . . acting

4    as receiver . . . for gross negligence, including any similar conduct or conduct that demonstrates a

5    greater disregard of a duty of care (than gross negligence) including intentional tortious conduct,

6    as such terms are defined and determined under applicable State law.").  Accordingly, as the FDIC

7    acknowledges, its Complaint against the Outside Directors can survive only if it states a claim for

8    gross, and not merely ordinary, negligence, as gross negligence is understood in California.

9                    **2.    Gross Negligence**

10           That the FDIC is limited to a claim of gross negligence against the Outside Directors is

11   significant.  Even if ordinary negligence was the applicable standard, the Complaint would need

12   to marshal facts supporting all "the traditional elements of negligence: duty, breach, causation, and

13   damages."  *See Rosencrans v. Dover Images, Ltd.*, 192 Cal. App. 4th 1072, 1082 (Cal. Ct. App.

14   2011).  A director who performs his or her duties "in good faith" and "with such care, including

15   reasonable inquiry, as an ordinarily prudent person in a like position would use under similar

16   circumstances . . . shall have no liability."  Cal. Corp. Code § 309(a), (c).  Such "a director shall

17   be entitled to rely on information, opinions, reports or statements, including financial statements

18   and other financial data, in each case prepared or presented by" management, counsel, experts,

19   and subcommittees of the Board.  *Id.* § 309(b).  Indeed, a director may "delegate the management

20   of the activities of the corporation to any person or persons," *id.* § 9210(b), and "will not be liable

21   for torts in which he does not personally participate, of which he has no knowledge, or to which

22   he has not consented," *PMC, Inc. v. Kadisha*, 78 Cal. App. 4th 1368, 1379 (Cal. Ct. App. 2000).

23           But in this case, where the Outside Directors cannot be held liable unless they were *grossly

24   negligent*, the FDIC's pleading burden is all the more demanding.  In California, as the FDIC

25   admits, the standard for gross negligence is exceedingly high—a "want of even scant care" or "an

26   extreme departure from the ordinary standard of conduct."  *F.D.I.C. v. Faigin*, 2013 WL 3389490,

27   at *8 (C.D. Cal. July 8, 2013); Compl. ¶ 128.  Gross negligence amounts to "the exercise of so

28                                            12

slight a degree of care as to raise a presumption of conscious indifference to the consequences." *Brown v. El Dorado Union High School Dist.*, 76 Cal. App. 5th 1003, 1027 (Cal. Ct. App. 2022). Factual allegations of anything short of that do not suffice.

What is more, the Complaint must allege specific facts, not mere legal conclusions. A leading case involving gross-negligence claims brought against directors illustrates the point. *Trenwick Am. Litig. Trust v. Ernst & Young, L.L..P*, 906 A.2d 168 (Del. Ch. 2006). There, "the complaint accuse[d] the board . . . of a lack of diligence." *Id.* at 173. The court nevertheless dismissed the claim because the complaint made those accusations by "conclusory insult, not by fact pleading." *Id.* In words that are equally apt here, the court explained that "[t]he complaint is entirely devoid of facts indicating that the board did not engage in an appropriate process of diligence." *Id.*; *see Kanter*, 92 Cal. App. 5th at 207 ("California courts have routinely relied on corporate law developed in the State of Delaware given that it is identical to California corporate law for all practical purposes." (internal quotation marks omitted)).

Finally, a claim of gross negligence must focus on the *process* that the directors used in making decisions, not a hindsight evaluation of the *substance* of those decisions. *See Off'l Comm. of Bond Holders of Metricom, Inc. v. Derrickson*, 2004 WL 2151336, at *4 (N.D. Cal. Feb. 25, 2004); *Brehm v. Eisner*, 746 A.2d 244, 264 (Del. 2000). "Courts give deference to directors' decisions reached by a proper process, and do not apply an objective reasonableness test in such a case to examine the wisdom of the decision itself." *Faigin*, 2013 WL 3389490 at *9 (quoting *Hill v. State Farm Mut. Auto. Ins. Co.*, 166 Cal. App. 4th 1438, 1493 (Cal. Ct. App. 2008)).

Not surprisingly, therefore, the few cases where courts have denied motions to dismiss claims of gross negligence brought against directors have involved complaints with specific factual allegations making plausible the assertion that the directors "wholly abdicated [their] corporate responsibility, closing [their] eyes to corporate affairs." *Castetter*, 184 F.3d at 1046. For example, in *Faigin*, the directors of a bank not only "approved" a series of loans based on "facially deficient" paperwork, but they also did so without first making any inquiry. 2013 WL 3389490, *9 (C.D. Cal. July 8, 2013). By contrast, courts have rejected gross-negligence claims premised on

supposedly bad investment choices where the complaint failed to establish that the process undertaken by the directors (or officers) reflected complete indifference to the effect of those investments on the company. For instance, in *1st Valley Credit Union v. Bland*, the plaintiff government agency alleged that the directors and officers of a credit union had caused the union "to make increasingly-risky investment decisions fueled increasingly by borrowing and focused heavily on private label mortgage backed securities." 2010 WL 8757250, at *1 (C.D. Cal. Dec. 20, 2010). The court dismissed the claim because, whatever the merit of those decisions, the complaint did not allege facts showing that the process the directors and officers undertook was so defective as to amount to gross negligence. *Id.* at *5, 10.

In short, to survive the Outside Directors' motion to dismiss the gross-negligence claim, the FDIC must plead actual facts (and not mere labels or conclusions) sufficient to make out a plausible case, not only that the Outside Directors directed or approved a transaction that was obviously not in the interests of SVB and its shareholder SVBFG, but also that they did so with such "scant care" that it can be reasonably said that they "d[idn't] care what [would] happen." *Brown*, 76 Cal. App. 5th at 1027. The Complaint does not remotely do so.

### 3. The Complaint Fails To Allege That The Outside Directors Directed or Approved Investments In the HTM Portfolio, Or To Identify Any Deficiency In The Board's Processes As To Those Investments

The Trust's gross-negligence claim as to the structuring of SVB's HTM portfolio fails for two independent reasons.

*First*, the Complaint contains no factual allegations showing that the investments in that portfolio ever even came to the Board for approval or were in fact approved by the Board. Rather, the Complaint improperly substitutes "conclusory insult" for "fact pleading." *Trenwick*, 906 A.2d at 173. For example, it asserts that the Outside Directors on SVB's Finance and Risk Committees, joined by the six Officer Defendants, all supposedly "caused" the Bank's ratio of HTM to AFS securities to increase over time. Compl. ¶ 130(a). But the Complaint does not include any facts to substantiate that entirely conclusory, and legally insufficient, assertion. It fails to identify a single instance in which any of the Outside Directors actually approved or otherwise "caused"

SVB to make any of the investments at issue.  So, too, the Complaint asserts that all the Outside Directors on the Finance and Risk Committees, again supposedly joined by all the Officer Defendants, "cause[d]" SVB to hold longer duration securities in its HTM portfolio.  *Id.* ¶ 82.  But, again, the Complaint fails to allege a single fact to substantiate that bald assertion.  It does not identify even one instance in which any Outside Director approved, encouraged, or even suggested that SVB make an investment in a supposedly too-long-dated security designated for the HTM portfolio.

*Second*, even if the Complaint contained any facts to suggest that any of the Outside Directors ever directed or approved any of the Bank's investments, it says absolutely nothing to show that the Board acted without even "scant care."  To the contrary, the Complaint repeatedly alleges that the Outside Directors actively participated in Board meetings, *id.* ¶¶ 48, 82, 91; engaged and consulted with leading experts, *id.* ¶¶ 3, 70; and received management recommendations and analyses, *id.* ¶¶ 70, 100.  The gross-negligence claim as to the HTM portfolio accordingly fails for this reason as well: the Complaint nowhere alleges any facts suggesting that the Outside Directors "fail[ed] to inform themselves fully and in a deliberate manner."  *In re Diadexus, Inc.*, 2019 WL 3412928, at *12 (N.D. Cal. July 29, 2019).

### 4.    The Complaint Fails To Marshal Any Facts Establishing That The Outside Directors Authorized The Termination Of Any Hedges, Let Alone That They Did So Without Engaging In Any Diligence

The FDIC's gross-negligence claim, asserted against the Outside Directors on SVB's Finance and Risk Committees, regarding the termination of interest-rate hedges in the AFS portfolio fails for the same two reasons.

*First*, the Complaint fails to allege any facts even remotely suggesting that those Outside Directors ever directed or approved the termination (or the initiation for that matter) of a single hedge.  To the contrary, the Complaint describes one (and only one) communication in which one of the Officer Defendants is alleged to have texted a single Outside Director to inform him of a decision to unwind a hedge that *management had already made*: "Just a quick head[s] up that we are unwinding today a part of our $10Bn hedging position . . . ."  Compl. ¶ 100.

*Second*, the Complaint again contains nothing regarding the process the Outside Directors employed. The Complaint is utterly silent, for example, whether any or all of the Outside Directors on the Finance and Risk Committees discussed the issue at one or more meetings, or whether they consulted with management and advisors.

The FDIC's failure to allege a single fact suggesting that the Outside Directors participated in the decision to remove any hedge, let alone that they did so without making any inquiry or conducting any diligence, is dispositive. The FDIC purported to conduct a two-year investigation into the relevant events before filing suit. If the FDIC had uncovered facts to support a claim that the Outside Directors acted with less than "scant care"—that they acted with "conscious indifference" to the fate of SVB, *Brown*, 76 Cal. App. 5th at 1027—it would surely have so alleged. The Complaint's silence speaks volumes and requires the dismissal of this part of the FDIC's gross negligence claim as well.

> **5.** **The Complaint Does Not And Cannot Allege That The Outside Directors Approved The October 2022 Dividend Without Engaging In Any Diligence Or Process Or That The Dividend Reduced SVBFG's Ability To Act As A Source Of Strength For SVB**

The final transaction that is the subject of the FDIC's gross-negligence (and other) claims is the declaration in October 2022 of the $294 million Dividend from SVB to its parent, SVBFG. At least as to this one transaction, the Complaint alleges that the Finance Committee of the Board of SVB approved the Dividend. Compl. ¶ 112. But the claim still fails for multiple reasons.

Most importantly, the Complaint's own allegations show that the Finance Committee engaged in a process that was the antithesis of "scant care." The Finance Committee declared the Dividend on the "recommendation" of SVB's senior management team. *Id.* ¶ 109. In particular, the Complaint acknowledges that a management committee on which no Outside Directors sat recommended payment of the Dividend (*id.* ¶ 108); that the Finance Committee of the Board received a memorandum from management explaining that recommendation (*id.* ¶ 109); that the final amount of the Dividend was determined, not by the Finance Committee or the Board as a whole, but by SVB's senior management, based on the Bank's then-financial condition (*id.* ¶ 114);

and that, in fact, SVB had sufficient income to pay the Dividend under both "SVB internal policies and regulatory requirements" (*id.* ¶ 104). The Outside Directors were entitled to rely "on information, opinions, reports or statements, including financial statements and other financial data, in each case prepared or presented by" management. Cal. Corp. Code § 309(b). That is precisely what they did, and the gross negligence claim as to the Dividend fails for this reason alone.

But the claim also makes no sense. The FDIC argues that, under federal law, SVBFG was obligated to act as a "source of strength" for SVB. Compl. ¶ 5. It acknowledges, however, that the reason for the Dividend was to enhance SVBFG's "liquidity"—in other words, to put SVBFG in a better position to act as a source of strength, as and when needed, for SVB. *Id.* ¶ 109. And, at the time, SVBFG maintained approximately $2 billion in cash at SVB, an amount some seven times greater than the full amount of the Dividend ($294 million). *See SVB Fin. Tr. v. Fed. Deposit Ins. Corp., as Receiver for SVB*, Case No. 5:24-cv-01321-BLF (N.D. Cal.), Dkt. No. 135, Answer of FDIC, ¶ 67; *see also SVB Fin. Tr. v. Fed. Deposit Ins. Corp.*, Case No. 5:23-cv-06543-BLF (N.D. Cal.), Dkt. No. 130, CMC Statement, at 2. Not surprisingly, the Complaint does not and cannot allege that any regulator raised any concerns regarding SVB's well-disclosed plan to pay the Dividend.

For all these reasons, the gross-negligence claim is as deficient regarding the Dividend as it is regarding the structure of the HTM portfolio and any removal of hedges in the AFS portfolio.

**B.    The Complaint Fails To Plead A Claim For Breach Of The Duty Of Care Under State Law Both Because The Board's Liability Was "Eliminated To The Fullest Extent Of California Law," And Because The Complaint Does Not Even Attempt To Plead A Violation Of California's Dividend Statute.**

**1.    The Bank's Articles Of Incorporation Eliminated All Liability Up To Intentional Misconduct Or Recklessness, and The Complaint Does Not Remotely Allege Such Misconduct.**

In Count Three, the Complaint purports to assert a claim under California state law against the Outside Directors for breach of the duty of care. That claim fails for all the same reasons the gross-negligence claim fails in Count Two, and even more so.

1    As discussed, SVB's Articles of Incorporation exculpated its Outside Directors from all

2  liability for any alleged breach of the duty of care "to the fullest extent" permitted under California

3  law, *supra* note 7, which authorizes such exculpation other than for liability based on, as relevant

4  here, a "reckless disregard" of a director's duties or "an unexcused pattern of inattention that

5  amounts to an abdication of the director's duty."  Cal. Corp. § 204(a)(10)(iv) & (v). And in

6  California, the test for "reckless disregard" is extraordinarily high—an "intentional act or

7  intentional[] fail[ure] to act in accordance with [a director's] duties, (2) with knowledge, or with

8  reason to have knowledge, that (3) the director's conduct creates a substantial risk of serious harm

9  to the corporation or its shareholders."  *Kanter*, 92 Cal. App. 5th at 208.  Similarly, "an abdication

10  of the director's duty" requires an "'intentional failure to act in the face of a known duty to act[.]'"

11  *Id.* at 207, 209 (quoting Cal. Corp. § 204(a)(10)(A)(v)) (cleaned up).  Thus, to state a claim for

12  breach of the duty of care under California law, the Complaint would have to include allegations

13  of fact that make it plausible to conclude that the Outside Directors engaged in intentional acts that

14  were in reckless disregard of their duties to SVB (and its shareholder SVBFG).[8]

15    Indeed, California has adopted the law of Delaware in treating a claim premised on

16  "reckless disregard" of a director's duties or "an unexcused pattern of inattention that amounts to

17  an abdication of the director's duty" as a so-called *Caremark* claim.  *Kanter*, 92 Cal. App. 5th at

18  208 (quoting Cal. Corp. § 204(a)(10)); *see also In re Caremark Intern., Inc. Deriv. Litig.*, 698 A.2d

19  959 (1996).  A *Caremark* claim is "'possibly the most difficult theory in corporation law upon

20  which a plaintiff might hope to win a judgment'"—so much so that it is viewed as a claim for

21

---

22  [8] The Complaint does not even purport to assert that the Outside Directors engaged in "intentional misconduct" or knowing violation of law, or in ways the Outside Directors themselves "believe[d] to be contrary to the best interests of [SVB] or [SVBFG]."  *Id.* § 204(a)(10)(i) & (ii).  As for the only other category of extraordinary acts that cannot be exculpated under California law—a "transaction from which a director derived an improper personal benefit" (*id.* § 204(a)(10)(iii))—the Complaint merely notes in passing, in connection with its claims relating to the Dividend, that the Outside Directors held stock in SVBFG.  Compl. ¶ 107.  But it is common for directors to hold common shares in the corporation.  *See, e.g., In re Oracle Corp.*, 867 A.2d 904, 930 (Del. Ch. 2004), aff'd, 872 A.2d 960 (Del. 2005).  In any event, the Complaint does not and cannot allege that SVBFG used even a penny of the Dividend from SVB to pay a dividend to its common shareholders, including the Outside Directors (or, indeed, that SVBFG ever paid a dividend to its common shareholders).

23

24

25

26

27

28                                    18

breach of the duty of loyalty, not for breach of the duty of care. *Kanter*, 92 Cal. App. 5th at 206 (quoting *City of Birmingham Retirement & Relief Sys. v. Good*, 177 A.3d 47, 55 (Del. 2017), 210 (noting that *Caremark* claims sound in the duty of loyalty). To state such a claim, a complaint must include allegations of fact making it plausible that the directors acted in "bad faith." *Id.* That is an even higher pleading burden than the already demanding standard that applies to the FDIC's claim under federal law for gross negligence in Count Two. *See In re Verifone Holdings, Inc. Shareholder Deriv. Litig.*, 2009 WL 1458233, at *8 (N.D. Cal. May 26, 2009) ("A failure to act in good faith is the underpinning of the *Caremark* standard and requires conduct that is qualitatively different from, and more culpable than, the conduct giving rise to a violation of the fiduciary duty of care (i.e., gross negligence).").

For the reasons discussed above, the Complaint does not come close to pleading facts to state a claim for gross negligence. It follows *a fortiori* that the Complaint fails to state a claim for intentional wrongdoing or recklessness as well.

> ### 2. The FDIC-R's Claim That the Outside Directors Breached The Duties Of Care Or Loyalty By Approving The Dividend Also Fails For The Independent Reason That California's Statute Permitting The Payment Of A Dividend By A Solvent Company Covers The Field

The FDIC's claims for breach of fiduciary duty relating to the Dividend also fails because there is no such cause of action under California law.

The California legislature has enacted a statute that addresses the circumstances in which directors of a company may authorize the payment of a dividend. The California Corporations Code generally permits directors to declare a dividend if they have determined in good faith that the value of the company's remaining assets will continue to exceed the amount of its liabilities, and the company is likely to be able to continue to pay its debts as they mature. Cal. Corp. Code §§ 166, 500 and 501. These statutory provisions "'cover[] the field'" with respect to a director's potential liability for authorizing the declaration and payment of a dividend or other distribution to shareholders. *In re Jacks*, 266 B.R. 728, 737 (B.A.P. 9th Cir. 2001) (quoting *In re Jacks*, 243 B.R. 385, 392–93 (Bankr. C.D. Cal. 1999)). As a result, "[c]laims for a director's negligent breach

of fiduciary duty [with respect to the declaration of a dividend] are preempted by statute." *F.D.I.C. v. Ching*, 2014 WL 3361974, at *5 (E.D. Cal. July 8, 2014) (granting summary judgment on claim that directors violated the duty of care in declaring a dividend where the FDIC failed to allege violations of the California Corporation Code).

The FDIC has not even attempted to plead a claim for violation of the statute, and for good reason.  As discussed above, the Complaint acknowledges that the Outside Directors on SVB's Finance Committee obtained the recommendation of senior management that the Bank could pay the Dividend under applicable law.  And, while the Complaint alleges that the market value of SVB's stock was not then as high as it had been in the past, the FDIC nowhere alleges that SVB was insolvent when the Finance Committee approved the declaration of the Dividend, an allegation that would be especially implausible since the applicable accounting rules allowed SVB not to revalue its HTM portfolio on its balance sheet based on fluctuations in interest rates and yet SVBFG disclosed the actual market value of that portfolio in its SEC filings.  Indeed, the Complaint acknowledges that, at the time, SVBFG's stock was trading at more than $335 dollars per share, Compl. ¶ 107, for a market capitalization of some $19.8 billion, evidencing the financial market's assessment that SVBFG (and SVB, which was by far SVBFG's principal asset, *id.* ¶ 32) remained amply solvent.[9] And the FDIC does not and cannot cite to any concern raised by any regulators at the time regarding the Bank's capitalization.  To the contrary, regulators gave SVB the highest possible rating for capitalization just months prior to its failure.  *See* Anker Decl., Ex. 11, Aug. 17, 2022 FRBSF and DFPI Ltr. to SVB, at 9.

Because the Complaint does not and cannot allege that the Outside Directors violated the Corporations Code in approving the declaration of the Dividend, the FDIC's common-law claim for breach of the duty of care fails.  Judge Mueller's decision in *Ching* is on all fours.  There, as here, the FDIC, as receiver of a bank, sued a bank's directors for breach of the duty of care (and for negligence) in authorizing the Bank to pay a dividend to its shareholders.  Judge Mueller

---

[9] *See supra* note 5 and accompanying text.

granted the directors summary judgment, holding as a matter of law that the California legislature had "preempted" any such common law claims through its enactment of the specific provisions in the Corporations Code governing a board's authorization for the company to pay a dividend. *Id.* at *5. The same analysis applies in this case.

For this reason, and because the Complaint does not come close to pleading the required recklessness or intentional wrongdoing as to any of the three sets of transactions at issue, the Complaint's duty of care claim against the Outside Directors should be dismissed.

### C.    The Complaint Fails To Plead A Claim For Breach Of The Duty Of Loyalty Because The Interests Of SVB And Its Sole Shareholder, SVBFG, Were Aligned As A Matter Of Law

The FDIC's claim that the Outside Directors breached their duty of loyalty to SVB fails as to the Dividend for the same reason, discussed immediately above, that the duty of care claim also fails with respect to that transaction: the California Corporations Code precludes such a claim.

But the FDIC's duty of loyalty claim regarding all three transactions at issue is legally deficient for another reason. It is premised on a foundational misunderstanding of governing corporate law—or an attempt to rewrite that law. The claim is predicated on the notion that SVB had interests in conflict with those of its sole shareholder, SVBFG. Compl. ¶ 137. That may be what the FDIC wishes the law were, but it is not what the law is.

"A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one." *Asahi Kasei Pharma Corp.*, 204 Cal. App. 4th at 10 (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984) (applying accepted corporate law to its interpretation of the Sherman Act)). "[T]he subsidiary acts for the benefit of the parent, its sole shareholder. If a parent and a wholly owned subsidiary do 'agree' to a course of action, there is no sudden joining of economic resources that had previously served different interests." *Copperweld*, 467 U.S. at 771. Rather, those economic resources always serve the *same* interest. As a result, "in a parent and wholly-owned subsidiary context, the directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best

1  interests of the parent and its shareholders." *Anadarko Petroleum Corp. v. Panhandle Eastern*

2  *Corp.*, 545 A.2d 1171, 1174 (Del. 1988).

3      This is not only the law of Delaware, where SVBFG was incorporated, but also of

4  California, where SVB was chartered. The California legislature has expressly so provided. The

5  California Corporations Code specifies that a director "shall perform the duties of a director . . . in

6  a manner such director believes to be in the best interests of *the corporation and its shareholders*."

7  Cal. Corp. Code § 309(a) (emphasis added). That principle—that a director must act in the best

8  interests of both the company and its shareholders—would be impossible to perform if the law

9  viewed the interests of the company and its shareholders as in conflict, rather than in harmony.

10  *See Asahi Kasei Pharma Corp.*, 204 Cal. App. 4th at 10; *Richardson v. Reliance Nat. Indem. Co.*,

11  2000 WL 284211, at *12 (N.D. Cal. Mar. 9, 2000) (citing with approval the Delaware Supreme

12  Court's decision in *Anadarko*, and holding that directors of a wholly-owned subsidiary owe duties

13  not only to the parent but also to the parent's shareholders; "California courts would reach the

14  same decision [as the Delaware Supreme Court reached in *Andarko*] if faced with this issue").

15      That corporations exist for the benefit of their shareholders, and that directors are bound to

16  act in the best interests of both the company and its shareholders, are basic precepts of state

17  corporate law. The interests of a corporation and its parent are necessarily aligned, because the

18  former is wholly owned by the latter. *Copperweld*, 467 U.S. at 771 ("[T]he subsidiary acts for the

19  benefit of the parent, its sole shareholder."). Here, SVB's only shareholder was SVBFG, and

20  therefore the Outside Directors of SVB owed a duty of loyalty to act in accord with, not contrary

21  to, the best interests of SVBFG.

22      This rule applies just as much in the banking context as in any other. California courts

23  have declined, for example, to hold that banks or their directors owe special duties to the banks'

24  depositors that might diverge from those parties' duties to the bank's parent, except in rare and

25  unusual circumstances, such as where the depositors were unsophisticated non-profit organizations

26  that relied on the bank for their financial decisions. *See Copesky v. Superior Ct.*, 229 Cal. App.

27  3d 678, 689–90 (Cal. Ct. App. 1991); *In re Bank of Am. Cal. Unemployment Benefits Litig.*, 674

28

F. Supp. 3d 884, 934 (S.D. Cal. 2023).  The Complaint acknowledges that those special circumstances did not exist in this case.  SVB's depositors were anything but unsophisticated; to the contrary, the depositor base was "heavily concentrated' in "venture-capital-backed companies" operating in "the technology and life-sciences sectors."  Compl. ¶ 44.

Indeed, this foundational rule of corporate law has special force in this case.  As the FDIC acknowledges, SVB represented nearly 99% of the value of SVBFG, and SVBFG maintained some $2 billion in cash at SVB.  Compl. ¶ 32; *see SVB Fin. Tr. v. Fed. Deposit Ins. Corp., as Receiver for SVB*, Case No. 5:24-cv-01321-BLF (N.D. Cal.), Dkt. No. 135, Answer of FDIC, ¶ 67; *see also SVB Fin. Tr. v. Fed. Deposit Ins. Corp.*, Case No. 5:23-cv-06543-BLF (N.D. Cal.), Dkt. No. 130, CMC Statement, at 2.  The Complaint does not and cannot allege that SVBFG was "bleeding" SVB of funds for the benefit of a different subsidiary.

Yet, the Complaint repeatedly impugns SVB's Outside Directors for also serving on the Board of SVBFG's, as if doing so was improper or unusual.  *E.g.*, *id.* ¶¶ 26, 33–36, 38, 40, 74. Not so.  Precisely because the interests of a subsidiary and its parent are aligned as a matter of law, overlapping boards and officers are common, as the FDIC well knows.  *See* Society for Corp. Governance, Comment to FDIC, Dec. 14, 2023, 5 ("Overlapping board memberships are typical among banking institutions.") *available at* https://www.fdic.gov/system/files/2024-06/2023-guidelines-establishing-standards-for-corporate-governance-3064-af94-c-014.pdf.   Indeed, they are so routine that, after SVB went into receivership, the FDIC proposed amending its regulations to limit overlapping boards between bank and bank holding companies, albeit even then only under certain, limited circumstances. *See* Guidelines Establishing Standards for Corp. Governance and Risk Mgmt. for Covered Inst. with Total Consolidated Assets of $10 Billion or More, 88 Fed. Reg. 70391 (proposed October 11, 2023).  That the FDIC felt the need to propose a *change* in its own regulations *after* the events at issue makes clear the law permitted SVB and SVBFG to have overlapping boards at the time those events occurred.

There is a serious question whether the FDIC would have the power on its own, without an act of Congress, to preempt the foundational precept of state corporate law that the interests of a

23

parent and subsidiary are in harmony and that there is therefore nothing wrong with having the directors of a subsidiary also serve as directors of the parent.[10]  But, whatever the answer to that question might be, the critical, indisputable point is that, at the time the Outside Directors sat on the Boards of both SVB and SVBFG, the law allowed them to do so.  And the law remains the same today.  Indeed, the FDIC's efforts to amend its regulations to prohibit overlapping directors in some situations met considerable opposition,[11] and the FDIC *withdrew* the proposal.  *See* Guidelines Establishing Standards for Corporate Governance and Risk Management for Covered Institutions With Total Consolidated Assets of $10 Billion or More; Regulations Implementing the Change in Bank Control Act; Withdrawal, 90 FR 12115-01, 2025 WL 800953 (F.R.)

The FDIC's statement that "[t]here were no independent directors of SVB," Compl. ¶ 33, evidences its failure to come to grips with the law as it actually is (and was at the time of the relevant events), rather than what the FDIC wishes the law to be.  Of course there were independent directors of SVB, including an independent chair of the Board.  None of the eleven Outside Directors was an employee or officer of SVB or SVBFG.  They were Outside Directors of both the parent and the subsidiary, and they owed their duties to both SVB and its shareholder, SVBFG, which had a unity of interests.  The Complaint does not and cannot allege that the overlap in the Boards of SVB and SVBFG was somehow hidden from state and federal regulators, or that any regulator ever—even once—objected.

---

[10] *See, e.g.*, *West Virginia v. Environmental Protection Agency*, 597 U.S. 697, 723 (2022) ("We presume that 'Congress intends to make major policy decisions itself, not leave those decisions to agencies.'") (citation omitted).

[11] *See, e.g.*, Conference of State Bank Supervisors, Comment to FDIC, Feb. 7, 2024, at 11 ("Virtually all the covered banks subject to the proposal have a holding company structure and, in state regulators' experience, are likely to have overlapping membership of their holding company board and subsidiary bank board. In our collective experience as supervisors, this is a common practice throughout the country and not one that is problematic."), *available at* https://www.fdic.gov/system/files/2024-06/2023-guidelines-establishing-standards-for-corporate-governance-3064-af94-c-039.pdf; Society for Corporate Governance, Comment at 5 (noting that the proposal "is, in some instances, *inconsistent* with other regulations," and that "[o]verlapping board memberships are typical among banking institutions and do not run afoul of independence rules established by the OCC, the Federal Reserve, the FDIC's own independence rules, or the context-based approach followed by most corporate governance authorities such as in state corporation law, federal securities regulations, or stock exchange listing manuals").

In short, the Board did not breach a duty of loyalty to SVB by acting in what it believed was the best interests of *both* SVB and SVBFG.  The Board owed its duties to act in, not against, the interests of SVBFG because the interests of a wholly owned subsidiary and its parent are aligned as a matter of law.  The FDIC-R's duty of loyalty claim flies in the face of this settled rule and, as such, cannot stand.

## V.    CONCLUSION

The FDIC's Complaint fails as a matter of law.  It should be dismissed in its entirety.

Dated: April 16, 2025                    Respectfully Submitted,

                                          */s/ Philip D. Anker*_____
                                         PHILIP D. ANKER

                                         Lorraine B. Echavarria (CA SBN 191860)
                                         WILMER CUTLER PICKERING
                                            HALE AND DORR LLP
                                         350 South Grand Avenue, Suite 2400
                                         Los Angeles, CA 90071
                                         lori.echavarria@wilmerhale.com

                                         Michael A. Mugmon (CA SBN 251958)
                                         Caleb J. Lin (CA SBN 316869)
                                         WILMER CUTLER PICKERING
                                            HALE AND DORR LLP
                                         50 California Street, Suite 3600
                                         San Francisco, CA 94111
                                         michael.mugmon@wilmerhale.com
                                         caleb.lin@wilmerhale.com

                                         Philip D. Anker (appearance pro hac vice)
                                         WILMER CUTLER PICKERING
                                            HALE AND DORR LLP
                                         7 World Trade Center
                                         250 Greenwich Street
                                         New York, NY 10007
                                         philip.anker@wilmerhale.com

                                         *Counsel for Defendants Eric Benhamou, Elizabeth Burr, Richard Daniels, Alison Davis, Roger Dunbar, Joel Friedman, Jeffrey Maggioncalda, Beverly Kay Matthews, Mary Miller, Kate Mitchell, and Garen Staglin*